IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:21cr49-MHT-JTA |
| | ) | [18 U.S.C. § 371; |
| WILLIAM LEE HOLLADAY, III | ) | 18 U.S.C. § 1343; |
| a/k/a "Trey," | ) | 18 U.S.C. § 1028A(a)(1); |
| DEBORAH IRBY HOLLADAY | ) | 18 U.S.C. § 2] |
| a/k/a "Deb," | ) | |
| WILLIAM RICHARD CARTER, JR. | ) | |
| a/k/a "Rick," | ) | |
| GREGORY EARL CORKREN | ) | |
| a/k/a "Greg," | ) | |
| DAVID WEBB TUTT, and | ) | |
| THOMAS MICHAEL SISK | ) | |
| a/k/a "Tom," | ) | INDICTMENT |

The Grand Jury charges:

## I. INTRODUCTION

### A. The Defendants

1. From in or about July of 2013 and continuing until on or about October 31, 2020,

Defendant WILLIAM LEE HOLLADAY, III a/k/a "Trey" (hereinafter, "TREY HOLLADAY")

was the superintendent of the Athens, Alabama City School District. Before assuming this

position, TREY HOLLADAY worked as an athletics coach, teacher, and administrator for

various public school districts in Alabama. At all times material to this indictment, TREY

HOLLADAY was married to DEBORAH IRBY HOLLADAY.

2. From in or about August of 2013 and continuing until on or about June 1, 2017,

Defendant DEBORAH IRBY HOLLADAY a/k/a "Deb" (hereinafter, "DEBORAH

HOLLADAY") was a teacher employed by the Athens City School District. On or about June 1,

2017, DEBORAH HOLLADAY retired.

3.     From in or about August of 2015 and continuing to the present, Defendant

WILLIAM RICHARD CARTER, JR. a/k/a "Rick" (hereinafter, "CARTER") was an employee

of the Athens City School District. From on or about August 17, 2015 and continuing until on or

about October 15, 2015, CARTER was a technology teacher at Athens Renaissance School.

From on or about October 15, 2015 and continuing until on or about June 28, 2016, CARTER

was the coordinator of virtual programs for the Athens City School District. From on or about

June 28, 2016 and continuing until on or about July 20, 2017, CARTER was the director of

innovative programs for the Athens City School District. From on or about July 20, 2017 and

continuing until an unknown date, CARTER was the executive director of innovative programs

for the Athens City School District. In this position, CARTER's duties included overseeing

innovative programs and charter school authorization. During his time working for the Athens

City School District, CARTER also held the positions of: (1) interim principal of Athens Middle

School; (2) principal of Athens High School; and (3) executive director of planning.

4.     At all times material to this indictment, Defendant GREGORY EARL

CORKREN a/k/a "Greg" (hereinafter, "CORKREN") was a resident of Tuscaloosa County,

Alabama and was a retired public educator. CORKREN retired in or about 2015. Before

retiring, CORKREN held various positions, including teacher, athletics coach, and administrator,

for various public school districts in Alabama. CORKREN was a longtime friend of TREY

HOLLADAY.

5.     At all times material to this indictment, Defendant DAVID WEBB TUTT

(hereinafter, "TUTT") was a resident of Marengo County, Alabama. During his professional

career, TUTT held various positions, including football coach at Marengo Academy in Linden,

Alabama. TUTT was a longtime friend of TREY HOLLADAY.

2

6.      At all times material to this indictment, Defendant THOMAS MICHAEL SISK a/k/a "Tom" (hereinafter, "SISK") was the superintendent of the Limestone County, Alabama School District.

**B.      Relevant Public School Districts and Schools**

**1.      Athens City Schools**

7.      At all times material to this indictment, the Athens City School District (hereinafter, "ACS") was a Kindergarten through 12th grade (hereinafter, "K-12") public school district serving Athens.

8.      On or about May 15, 2014, the ACS board of education adopted Policy JBCB, the "Non-Resident Student Admissions - Policy." This policy gave the ACS superintendent and the ACS board of education the authority to accept an application for enrollment from a non-resident student. Subject to limited exceptions, the policy required ACS to charge tuition in the amount of $1,200 per year to any non-resident student admitted under the policy. Policy JBCB was in effect during all times relevant to this indictment.

9.      From on or about January 20, 2016 and continuing to the present, ACS was a "public charter school authorizer." As such, ACS had authority to approve or deny applications by groups seeking to form charter schools within the geographic boundaries of ACS.

10.     From in or about the fall of 2016 and continuing to the present, the Athens Renaissance School (hereinafter, "Athens Renaissance") was a virtual and blended K-12 public school operated by ACS. Before becoming a standalone school, from on or about an unknown date until in or about the fall of 2016, Athens Renaissance was a virtual education program of Athens High School. During all times material to this indictment, Athens Renaissance offered "blended" and "virtual" education models. Students enrolled in a blended education model

3

attended physical Athens Renaissance campuses approximately two days per week (or on an as-needed basis) and, on other days, attended school virtually using an online learning management system. Students enrolled in a virtual education model did not attend an Athens Renaissance campus and instead attended school exclusively through an online learning management system.

11.     A "learning management system" is a software application used for the administration, documentation, tracking, reporting, and delivery of virtual educational courses. Learning management systems are often developed by third-party corporations and sold to school systems for use in virtual schools or programs.

12.     During the period relevant to this indictment, Athens Renaissance used several learning management systems. Among the learning management systems used by Athens Renaissance was Odysseyware. Unlike some learning management systems, Odysseyware did not provide live instructors. Rather, it provided only written and prerecorded content and assessment tools. Accordingly, users of Odysseyware were required to employ instructors and administrators to oversee Odysseyware-based courses.

13.     On or about June 11, 2015, the ACS board of education adopted Policy ILB. Policy ILB governed the operation of Athens Renaissance. Policy ILB provided, in part, that "[Athens Renaissance] courses and programs are free for enrolled full-time students meeting the residency requirements of Policy JBC, and available for a non-resident student tuition fee for enrolled full-time, non-resident students who meet Policy JBCB eligibility requirements and Athens City Schools [ACS] enrollment procedures." Policy ILB also permitted students to be "guest" enrolled in Athens Renaissance. Guest-enrolled students would take a limited number of virtual courses through Athens Renaissance and otherwise remain enrolled in another public,

4

private, or home school. Policy ILB required guest enrollees to "pay a fee relative to the number of courses they take." Policy ILB was in effect at all times material to this indictment.

14.     On or about June 11, 2015, the ACS board of education also adopted the Addendum to Policy ILB. The Addendum to Policy ILB, in pertinent part, defined what constituted a "full-time" student of Athens Renaissance: "Full-time students are required to take, at minimum, six (6) credits per year at either the traditional or accelerated pace." The Addendum to Policy ILB also required Athens Renaissance to identify truant students. The policy stated that a virtual student was considered truant when he or she was more than 15 percent off pace in one or more of his or her classes. When a student became truant, the Athens Renaissance principal was to "send official notification to the student and parent(s)/guardian(s) notifying all parties that the student is truant and in violation of Alabama's Compulsory School Attendance Law."

15.     At all times material to this indictment, the Alabama Renaissance School (hereinafter, "Alabama Renaissance") was a proposed public charter school. On or about August 3, 2017, the ACS board of education, as a charter school authorizer, voted to convert part of Athens Renaissance into a charter school to be known as Alabama Renaissance. Alabama Renaissance was to serve Alabama students located outside of the greater Athens area. Alabama Renaissance was to be overseen by an independent board, and it was to hire a separate entity to manage its operations. Alabama Renaissance did not educate students during the 2017–2018 school year. In or about the summer of 2018, efforts to establish Alabama Renaissance were abandoned.

**2.     Limestone County Schools**

5

16.    At all times material to this indictment, the Limestone County School District (hereinafter, "LCS") was a K-12 public school district headquartered in Athens and serving students in Limestone County, Alabama.

17.    During the 2016–2017 school year, LCS operated a virtual education program, the Limestone County Virtual School. Limestone County Virtual School was not a separate school recognized by the Alabama State Department of Education. Instead, it was a program that provided virtual education courses to students of brick-and-mortar schools operated by LCS.

18.    During the 2016–2017 school year, LCS delivered virtual education courses to Limestone County Virtual School students using the learning management system, Odysseyware. LCS did not, however, have any license to use Odysseyware. Rather, students of Limestone County Virtual School took Odysseyware courses using a license paid for by ACS.

### 3.    Conecuh County Schools

19.    At all times material to this indictment, the Conecuh County School District (hereinafter, "CCS") was a K-12 public school district headquartered in Evergreen, Alabama and serving students in Conecuh County, Alabama. At all times material to this indictment, Z.B. was the superintendent of CCS.

20.    At all times material to this indictment, CCS operated the Genesis Innovative School. Genesis Innovative School offered virtual courses to students it enrolled. Genesis Innovative School offered these courses through multiple learning management systems.

21.    During the 2017–2018 school year, some students of Genesis Innovative School used the learning management system, Odysseyware. CCS did not, however, have any license to use Odysseyware. Rather, students of Genesis Innovative School took Odysseyware courses using a license paid for by ACS.

6

**C.    Relevant Private Schools**

22.    At all times material to this indictment, Marengo Academy was a K-12 private school located in Linden. Marengo Academy required students to pay tuition.

23.    At all times material to this indictment, Jackson Academy was a K-12 private school located in Jackson, Alabama. Jackson Academy required students to pay tuition.

24.    At all times material to this indictment, Pickens Academy was a K-12 private school located in Carrollton, Alabama. Pickens Academy required students to pay tuition.

25.    At all times material to this indictment, the Lakeside School was a K-12 private school located in Eufaula, Alabama. The Lakeside School required students to pay tuition.

26.    At all times material to this indictment, Southern Academy was a K-12 private school located in Greensboro, Alabama. Southern Academy required students to pay tuition.

27.    At all times material to this indictment, Monroe Academy was a K-12 private school located in Monroeville, Alabama. Monroe Academy required students to pay tuition.

28.    At all times material to this indictment, Meadowview Christian School was a K-12 private school located in Selma, Alabama. Meadowview Christian School required students to pay tuition.

29.    At all times material to this indictment, Abbeville Christian Academy was a K-12 private school located in Abbeville, Alabama. Abbeville Christian Academy required students to pay tuition.

30.    At all times material to this indictment, Marion Academy was a K-12 private school located in Marion, Alabama. Marion Academy required students to pay tuition.

31.     At all times material to this indictment, Camden Christian Academy was a K-12 private school located in Camden, Alabama. Camden Christian Academy required students to pay tuition. Camden Christian Academy was not accredited.

**D.     Relevant Corporations**

32.     From on or about February 25, 2016 and continuing through the present, Educational Opportunities and Management, LLC (hereinafter, "Ed Op") was a limited liability corporation registered with the Alabama Secretary of State. At all times material to this indictment, the sole member of Ed Op was CORKREN.

33.     From on or about February 22, 2017 until on or about July 24, 2018, Tutt Educational Services, LLC (hereinafter, "Tutt Educational") was a limited liability corporation registered with the Alabama Secretary of State. At all times material to this indictment, the sole member of Tutt Educational was TUTT. On or about July 24, 2018, TUTT filed articles of amendment with the Alabama Secretary of State changing the name of Tutt Educational to "Tutt Consulting Services, LLC." On or about September 20, 2019, TUTT filed documents with the Alabama Secretary of State dissolving the renamed corporation.

34.     From on or about November 22, 2016 until on or about December 19, 2018, Sage Professional Development, LLC (hereinafter, "Sage") was a limited liability corporation registered with the Alabama Secretary of State. At all times material to this indictment, the sole member of Sage was DEBORAH HOLLADAY.

35.     From on or about April 12, 2016 and continuing until the present, Company A was a limited liability corporation registered with the Alabama Secretary of State.

8

**E.     The Alabama State Department of Education**

36.     The Alabama State Department of Education (hereinafter, "ASDE") is a state agency that oversaw all K-12 public school districts operating within Alabama. At all times material to this indictment, the ASDE was headquartered in Montgomery, Alabama, within the Middle District of Alabama. The state board of education governed the ASDE. The state board of education selected a state superintendent of education who administered the ASDE. The deputy state superintendent of education for the division of administrative and financial services oversaw the state's allocation of funds to public school districts.

**F.     Statewide Public Education Funding in Alabama**

37.     At all times material to this indictment, Alabama K-12 public school districts received funding from both local and statewide tax revenues. Statewide funding came predominately from the Education Trust Fund, an account administered by the state comptroller's office, located in Montgomery. To receive funding from the Education Trust Fund, a school district was required to participate in the Foundation Program. The ASDE administers the Foundation Program.

38.     At all times material to this indictment, as the head of the ASDE, the state superintendent of education was responsible for determining the amount of Foundation Program funding each local school district was entitled to receive. The state superintendent made these determinations using a formula set forth in state regulations. Generally, this formula linked each district's Foundation Program allocation to its "average daily membership." Average daily membership referred to the average number of students enrolled in a school district during the 20 school days immediately following Labor Day. In most cases, the higher a district's average daily membership, the higher its Foundation Program allocation would be. During the relevant

9

period, the Foundation Program formula resulted in a school district receiving between \$5,500 and \$7,000 per year for each whole student in its average daily membership.

39.   At all times material to this indictment, the state comptroller issued Foundation Program payments through electronic transfers. The state comptroller did so at the direction of the state superintendent of education.

40.   At all times material to this indictment, Foundation Program payments were made monthly and were made "in arrears." This meant that the average daily membership of a district during the 20-day period following Labor Day of Year X was used to determine the Foundation Program allocation that was paid to the district beginning on October 1 of Year X+1. That Foundation Program allocation was then paid in monthly installments from October of Year X+1 through September of Year X+2.

41.   At all times material to this indictment, to provide funding to districts who experienced sudden growth, the state superintendent of education also directed the state comptroller to issue to qualifying districts "Current Units" payments. Current Units payments were calculated by subtracting the previous year's average daily membership from the current year's average daily membership. The difference was then entered into a formula that determines a district's Current Units payments. Current Units payments were issued, in most cases, in or around December and June of the school year in which the average daily membership was calculated.

## G.   Alabama Virtual Education Law

42.   In or about April of 2015, the governor of Alabama signed into law Act No. 2015-89. The act dealt with virtual education offerings in Alabama public schools. Section 1 provided, "Before the 2016-2017 school year, each local board of education shall adopt a policy

10

providing, at a minimum, a virtual education option for eligible students in grades nine to 12, inclusive, beginning with that school year." The act went on to state that "[t]he policy shall offer students in grades nine to 12, inclusive, an online pathway for earning a high school diploma and, at a minimum, shall include all of the following: (1) The scope and delivery of virtual options. (2) Student eligibility criteria for initial and continuing participation in the virtual program. (3) Specific requirements for monitoring performance and testing protocol consistent with this act. (4) Attendance requirements, if any."

43.     Section 2(a) provided, "A full-time student enrolled in a virtual program shall be enrolled and counted in the average daily membership of the local school, participate in state testing and accountability requirements through the local school system, and, upon satisfying the graduation requirements of the local board of education, receive a diploma from the local school system."

## H.     Statewide Education Data Management

44.     At all times material to this indictment, K-12 public school districts in Alabama inputted student information into a computer-based education data management program. Each school district used the same program; however, each district maintained its own database within the program. The ASDE was able to access each district's student information management database.

45.     At all times material to this indictment, among the types of data in each district's program for each student enrolled in the district were: (1) schools attended and dates of attendance; (2) course schedules; (3) instructors; (4) grades earned in all classes; (5) attendance records; (6) standardized test scores; and (7) personal identifying information.

11

46.     At all times material to this indictment, because all public school districts in Alabama use the same student information management program, a student could only be enrolled in one district's database at any time. If a student already enrolled in one district's database attempted to enroll in a new district, the new district's database would send a notification to the old district and prevent enrollment in the new district.

47.     At all times material to this indictment, each year, following the 20-day period after Labor Day, officials with the ASDE accessed each district's student information management database and extracted information about each student enrolled in the district. The ASDE official used wire communication in interstate commerce to extract this data. ASDE officials then use the extracted data to calculate each district's average daily membership. Each district's superintendent was responsible for ensuring the accuracy of the enrollment information for his or her district.

48.     At all times material to this indictment, private school students were not included in any student information management database accessible to the ASDE.

## II. BACKGROUND EVENTS

### A.    ACS's Flexibility Waiver

49.     On or about June 16, 2015, TREY HOLLADAY, on behalf of ACS, sent an application to the ASDE for a "flexibility contract." A flexibility contract is entered into between the ASDE and a school district and allows the school district to obtain programmatic or budgetary flexibility regarding specified statutes or regulations in order to meet some innovative plan.

50.     The request submitted by TREY HOLLADAY sought flexibility regarding various state statutes and regulations in order to implement Athens Renaissance as a virtual

12

education option. In support of the request, ACS submitted Policy ILB and the Addendum to Policy ILB, recounted above.

51.    On or about September 3, 2015, while the application for the flexibility waiver was pending before the state superintendent of education, TREY HOLLADAY sent a letter to the state superintendent. The letter stated that, per TREY HOLLADAY's understanding, "Full-time students participating in the virtual option at the Renaissance School are enrolled as full-time students in the [ACS] system, in the same manner as traditional students." TREY HOLLADAY added that he hoped that Athens Renaissance would attract "home school students, private school students, and other non-traditional students that have abandoned public education for various reasons, and to enroll or 'recover' them as full-time students in our school system." TREY HOLLADAY informed the superintendent that ACS was "enrolling non-traditional students (who are not otherwise enrolled as public school students) from both our district and from across the State as full-time students in our school system (limited, of course, by our own logistical considerations, such as capacity)." The memorandum also mentioned guest-enrolled students, stating that such students would take a few courses with ACS but would remain enrolled in their schools. Guest-enrolled students would, according to TREY HOLLADAY, pay fees to ACS for taking courses through Athens Renaissance. TREY HOLLADAY acknowledged that ACS would not include guest-enrolled students "in our school system's average daily membership."

52.    On or about November 5, 2015, the state superintendent of education informed ACS, through a letter to TREY HOLLADAY, that the ASDE had approved the flexibility contract. The letter contained a list of "advisements and reminders." The attached list stated: "Concerning [ACS's] request to allow [ACS] to offer one or more traditional, online, or blended

13

courses to students enrolled in other public or non-public schools (or students that are home schooled) as 'guest students' (or transient students) for a fee, without enrolling them as students in the [ACS] (and thus, not receiving accompanying public funding for such students): No Foundation Program units are earned."

**B.      ACS's Fall 2015 Agreement with Marengo Academy**

53.      While the flexibility contract was pending, in or about September of 2015, TREY HOLLADAY came into contact with the administration of Marengo Academy. During discussions, TREY HOLLADAY suggested that Marengo Academy allow ACS to enroll Marengo Academy students in Athens Renaissance. TREY HOLLADAY offered Marengo Academy: (1) laptop computers; and (2) access to online courses through various learning management systems. In exchange, Marengo Academy would be required to provide ACS student identifying information, transcripts, and grades. At TREY HOLLADAY's direction, ACS officials would then use that information to enroll Marengo Academy students in Athens Renaissance and thus make it appear that the Marengo Academy students were full-time ACS non-resident virtual students.

54.      Marengo Academy accepted the offer from TREY HOLLADAY. Accordingly, in or about the fall of 2015, Marengo Academy officials provided student information to ACS officials. ACS officials then, acting at TREY HOLLADAY's direction, used that information to enroll the Marengo Academy students into ACS's student information management database. By doing so, the ACS officials made it appear that the Marengo Academy students were full-time non-resident virtual students of ACS.

55.      In fact, during the 2015–2016 school year, the Marengo Academy students were, at all times, full-time students of Marengo Academy. In most instances, tuition was paid to

14

Marengo Academy for the students to attend. On normal school days, the students reported to the brick-and-mortar campus of Marengo Academy in Linden. The students received instruction from teachers employed by Marengo Academy.

56.     In contrast, no tuition was paid to ACS for the Marengo Academy students. The students did not report to any campus of Athens Renaissance or any other ACS school. The students were not full-time students of Athens Renaissance or any other ACS school.

57.     Because the Marengo Academy students were listed in ACS's student information management database, the ASDE counted the Marengo Academy students when determining ACS's fall 2015 average daily membership. This resulted in an increased average daily membership for ACS when compared to its fall 2014 average daily membership.

## C.   March 2016 Meeting with ASDE Officials

58.     On or about March 2, 2016, TREY HOLLADAY attended a meeting in Montgomery at the ASDE office. There, he met with the state superintendent of education, the deputy state superintendent of education for the division of administrative and financial services, and others. An attorney for the ACS board of education also attended the meeting. During the meeting, the attendees discussed ACS's practice of enrolling private school students in Athens Renaissance and then counting those students in ACS's average daily membership. The deputy state superintendent of education for the division of administrative and financial services raised concerns about this practice. In response, TREY HOLLADAY and the ACS board of education attorney agreed to discontinue the practice of associating with private schools. During the meeting, the state superintendent also advised TREY HOLLADAY that ACS should refrain from enrolling in Athens Renaissance full-time virtual students who did not reside within approximately 100 miles of Athens.

15

59.     Following this meeting, on or about March 7, 2016, the ACS board of education

attorney sent an email message to the deputy state superintendent of education for the division of

administrative and financial services. In that message, the ACS board of education attorney

noted that, during the March 2 meeting, the participants "discussed the students who are enrolled

full-time in Athens City but who also attend Marengo Academy in some capacity." The attorney

then wrote that, in light of the ASDE officials' concerns about ACS's enrollment of these

students, ACS was "willing to 'pull back' with respect to this issue." As such, the attorney stated

that ACS would "not enroll any full-time student into its Renaissance School unless that student

first presents papers showing that, if he/she was enrolled in any public or private school, that

he/she has *withdrawn* from such school."

## III. THE CHARGES

### COUNT 1
(Conspiracy)

60.     The factual allegations contained in each of the foregoing paragraphs of this

indictment are hereby realleged and incorporated herein as if copied verbatim.

61.     Beginning in or about February of 2016 and continuing until in or about August

of 2018, in Montgomery County, within the Middle District of Alabama, and elsewhere, the

defendants,

WILLIAM LEE HOLLADAY, III a/k/a "Trey,"
DEBORAH IRBY HOLLADAY a/k/a "Deb,"
WILLIAM RICHARD CARTER, JR. a/k/a "Rick,"
GREGORY EARL CORKREN a/k/a "Greg,"
DAVID WEBB TUTT, and
THOMAS MICHAEL SISK a/k/a "Tom,"

16

as well as others, both known and unknown, did knowingly and intentionally conspire, combine, and agree with themselves and others to commit offenses against the United States, in violation of Title 18, United States Code, Section 371.

## OBJECTS OF THE CONSPIRACY

62.     It was an object of the conspiracy to knowingly and willfully execute and attempt to execute a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing that scheme, transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343; and

63.     It was an object of the conspiracy to execute and attempt to execute a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing that scheme, utilize the United States mail and private and commercial interstate carriers, in violation of Title 18, United States Code, Section 1341.

## PURPOSE OF THE CONSPIRACY

64.     It was a purpose of the conspiracy for ACS, LCS, and CCS to obtain greater state funding allocations through the Foundation Program than they would otherwise have been entitled to by purporting to enroll into their respective virtual schools students who were in fact full-time students of brick-and-mortar private schools and who were not taking even close to what could be considered full course loads through a virtual education program. ACS would then use, directly and indirectly, portions of the excess money to fund the completion of capital projects, including, the new campus of Athens High School.

17

65.     It was a purpose of the conspiracy for TREY HOLLADAY, DEBORAH

HOLLADAY, CARTER, CORKREN, TUTT, and SISK to obtain, directly and indirectly, for

their own personal use, portions of the increased revenue generated for ACS, LCS, and CCS by

the fraudulent enrollment of private school students in the ACS, LCS, and CCS virtual schools.

## MANNER AND MEANS

It was part of the conspiracy that:

## A.    2016–2017 School Year

### 1.     TREY HOLLADAY's Recruitment of CORKREN and the Formation of Ed Op

66.     In or about February of 2016, TREY HOLLADAY met with CORKREN.  During

the meeting and subsequent conversations, TREY HOLLADAY asked CORKREN to: (1) form a

limited liability corporation; (2) through the corporation, contract with ACS; (3) pursuant to that

contract, contact private schools and offer incentives to encourage the private schools to permit

ACS to enroll the private school students in Athens Renaissance; and (4) through the

corporation, receive payments from ACS.

67.     On or about February 25, 2016, CORKREN filed with the Alabama Secretary of

State documents creating Ed Op.  Ed Op was the corporation through which CORKREN would

do the things suggested by TREY HOLLADAY.

68.     On or about April 22, 2016, ACS and Ed Op entered into a "SERVICES

AGREEMENT."  TREY HOLLADAY executed the contract for ACS; CORKREN executed the

contract for Ed Op.  The term of the contract was to run from May 1, 2016 through June 30,

2017.  The preamble of the contract stated: "There are anticipated to be a significant number of

[Athens Renaissance] full-time and guest enrollment students in the Marengo County, Alabama

area . . . during the 2016-17 school year" and "ACS seeks assistance with respect to the logistics

18

and administrative issues presented by serving the Students." The contract obligated Ed Op to fulfill various responsibilities related to the students it would serve. For doing so, ACS agreed to pay Ed Op a fee of $45 per month per student serviced. The fee was to be paid monthly in arrears, with the first payment due on June 1, 2016 and the last payment due on July 1, 2017.

69. At some point thereafter, TREY HOLLADAY approached CORKREN and instructed CORKREN that CORKREN should give to TREY HOLLADAY a portion of the profits Ed Op would earn through any contract it entered into with ACS. TREY HOLLADAY directed CORKREN to make payments to him in cash.

## 2. Recruitment of Private Schools and ACS Digital Showcase

70. During in or about February, March, and April of 2016, TREY HOLLADAY and CARTER worked to recruit private schools to provide student information that could be used to enroll private school students in Athens Renaissance. They did so by offering the schools: (1) access to Odysseyware; (2) laptop computers; (3) increased internet capabilities; (4) standardized testing; and (5) monetary payments. In exchange, TREY HOLLADAY and CARTER asked the school officials to provide ACS (though Ed Op, the intermediary) with: (1) student and parent identifying information; (2) academic transcripts; and (3) at the end of each semester, copies of the students' report cards.

71. On or about May 2 and May 3, 2016, ACS hosted a "Digital Learning Showcase." TREY HOLLADAY, CARTER, and CORKREN attended this event. Representatives of Jackson Academy, Pickens Academy, the Lakeside School, and Southern Academy attended the event. ACS, directly or indirectly, paid for lodging and meals for these private school representatives. During the event, TREY HOLLADAY encouraged private school representatives to associate with ACS in exchange for various benefits.

19

72. Thereafter, representatives from each of the above-described four private schools accepted the above-described benefits and, in exchange, provided student information to CORKREN. CORKREN then relayed that information to ACS officials. The private school students were then fraudulently enrolled as full-time Athens Renaissance virtual students for the 2016–2017 school year. Additionally, in or about the summer of 2016, representatives from Marengo Academy, yet again, also agreed to and did provide student information to ACS for the 2016–2017 school year.

73. TREY HOLLADAY, CARTER, and CORKREN then began to use a code to refer to the private schools providing student information to be used for fraudulent enrollment. They referred to Marengo Academy as "EO1." Jackson Academy was "EO2." Pickens Academy was "EO3." The Lakeside School was "EO4." Southern Academy was "EO5."

**3. Enrollment of Private School Students in Athens Renaissance**

74. In or about June of 2016, ACS hosted a "Digital Instruction and Planning" training session in Athens. DEBORAH HOLLADAY presented at this session. Teachers from the following private schools attended the session: Jackson Academy, the Lakeside School, and Marengo Academy. During the session, the private school teachers learned about using Odysseyware.

75. In or about July of 2016, ACS hosted a second "Digital Instruction and Planning" training session in Athens. Teachers from the following private schools attended the session: Jackson Academy, Pickens Academy, Marengo Academy, and Southern Academy. During the session, the private school teachers learned about using Odysseyware.

76. In or about the summer of 2016, CORKREN visited the various campuses of the private schools that had agreed to provide student information to ACS. On some occasions, he

20

delivered laptop computers to the schools. These laptop computers were purchased with ACS funds. Some bore ACS property inventory stickers. Specifically, in or about August and September of 2016, CORKREN made the following computer deliveries at the direction of TREY HOLLADAY: (1) CORKREN delivered approximately 40 laptop computers to Pickens Academy; (2) CORKREN delivered approximately 50 laptop computers to Jackson Academy; (3) CORKREN delivered approximately 45 laptop computers to Southern Academy; and (4) CORKREN delivered approximately 50 laptop computers to the Lakeside School.

77.      On or about an unknown date, CORKREN delivered laptop computers to Monroe Academy. These laptop computers were the property of LCS.

78.      In or about the summer of 2016, CORKREN received from officials of the participating private schools completed "Athens City Schools Virtual/Non-Resident Enrollment Forms." Each enrollment form purported to be a document enrolling a particular student in Athens Renaissance. Each enrollment form contained for the subject student: the student's name, the parent or guardian's name, the student's address, the student's grade during the 2016– 2017 school year, the student's date of birth, and the student's school.

79.      Each form also contained the following release:

I understand, agree, and request that teachers and administrators at the Athens Renaissance School (as well as instructors and administrators of Ed-Op, Inc.) may provide information concerning any and all educational records of the student named above (including transcript information, class information and grades, disciplinary information, etc.) with all instructors, administrators, employees, and agents related to Ed-Op. I understand that this information may be used by such instructors, administrators, employees, and agents for, among other things, reviewing and discussing (i) the appropriate coursework and schedule, (ii) the performance and progress, and (iii) the grades and credits, of the student with respect to his/her classes with the virtual education program of the Athens Renaissance School.

I understand that I may revoke this Consent upon providing written notice to the Athens Renaissance School (or that the student may revoke this Consent after

21

reaching the age of 18), but that until such revocation is made, this Consent will remain in effect and the student's educational records will continue to be provided for the purpose stated above.

80.     At the bottom of each form was a line for a signature of a

"GUARDIAN/AUTHORIZED OFFICIAL." During in or about the summer of 2016,

CORKREN advised the private school headmasters or employees that they could sign the forms on behalf of their students. CORKREN gave this instruction to the private school officials because TREY HOLLADAY told him that the private school headmasters could sign the forms.

81.     During in or about the summer of 2016: (1) the headmaster of Jackson Academy signed enrollment forms for Jackson Academy students; (2) the assistant headmaster of Pickens Academy signed enrollment forms for Pickens Academy students; and (3) the headmaster of the Lakeside School signed enrollment forms for Lakeside School students. Parents or guardians (other than those who happened to be the headmaster or assistant headmaster of a school), did not sign the enrollment forms and did not otherwise consent to the transfer of their children's identifying information to ACS.

82.     By in or about August of 2016, CORKREN had collected Athens City Schools Virtual/Non-Resident Enrollment Forms pertaining to almost all of the private school students enrolled at the five participating private schools. CORKREN delivered these forms to ACS officials for those officials to use to enroll the students in Athens Renaissance.

83.     Some students of the Lakeside School resided in Georgia. Additionally, some students of Pickens Academy resided in Mississippi. TREY HOLLADAY instructed CORKREN to have the headmasters of the private schools create false Alabama addresses for the out-of-state students of the Lakeside School and Pickens Academy.

84.     On or about August 30, 2016, CARTER sent an email message to CORKREN.
The subject of the message was "Final To-Do List." In the message, CARTER wrote: "*Address
Change on the out of state addresses[.]" Later that day, CARTER sent an email message to two
Athens Renaissance employees. In that message, CARTER wrote, "Mr. Corkren will also send
us our new addresses for our EO students with out of state addresses."

85.     Thereafter, CORKREN created false Alabama addresses for the out-of-state
students. He did so by identifying vacant residential addresses in Alabama on real estate
websites, including Realtor.com. CORKREN used the vacant addresses as the false addresses
for the out-of-state students. CORKREN sent these false addresses to CARTER. CARTER then
caused ACS officials to enter the false addresses into ACS's student information management
database as though the students resided at the false addresses.

86.     Also during in or about the summer of 2016, CORKREN presented to officials at
participating private schools what purported to be Alabama Independent School Association
(hereinafter, "AISA") "Verification Release Forms." These forms were not legitimate AISA
forms. Rather, they contained, at the top, the misappropriated header of AISA. CORKREN
asked the private school officials to complete a Verification Release Form for each of their
students.

87.     The Verification Release Forms purported to authorize the release of information
about the subject student to the registrar of Athens Renaissance. Each form required the person
completing the form to state the "Purpose of Verification." On most of the forms, "UN-
ENROLLMENT" was indicated. At the bottom of each form, the "HEAD OF SCHOOL OR
REGISTRAR" was required to sign thus giving "consent for the named school above to release

23

the requested information." The Verification Release Forms did not have any space for a parent or guardian signature.

88.     By in or about August of 2016, CORKREN had collected Verification Release Forms signed by private school officials for many of the students to be enrolled from the participating private schools. Parents or guardians, subject to few exceptions, did not sign the release forms. CORKREN delivered these forms to ACS officials. The ACS officials kept each form in an ACS file as supposed proof that the subject student had un-enrolled from a private school before enrolling in Athens Renaissance.

89.     As TREY HOLLADAY, CARTER, and CORKREN then knew, the students named in the ACS enrollment and verification release forms and the parents of those students: (1) did not intend to enroll as full-time public school students for the 2016–2017 school year; and (2) did not intend to un-enroll from their respective private schools for the 2016–2017 school year.

90.     Also during in or about the summer of 2016, CORKREN received from officials of the participating private schools academic records related to the private schools' students. CORKREN delivered these records to ACS officials. ACS officials used the academic records to enroll the private school students in Athens Renaissance.

91.     Some schools, including Southern Academy and Marengo Academy, did not provide academic records until the spring of 2017. Upon receiving those records in the spring of 2017, CORKREN sent the records to CARTER.

## 4.     ACS's "Linden Hub"

92.     As noted, during the March of 2016 meeting, TREY HOLLADAY pledged that Athens Renaissance would only accept students who resided within an approximately 100-mile

24

radius of Athens. In or about the summer of 2016, TREY HOLLADAY caused ACS to open a facility in Linden—a location within 100 miles of Marengo Academy, Jackson Academy, Pickens Academy, and Southern Academy.

93.     In or about the summer of 2016, the superintendent of the Linden, Alabama City School District (hereinafter, "Linden City Schools") agreed to allow TREY HOLLADAY and ACS to access and use classroom space in an unused building under the custody and control of Linden City Schools. TREY HOLLADAY, CARTER, and other ACS officials referred to this space as Athens Renaissance's "Linden Hub." An ACS sign was placed in front of the Hub.

94.     During in or about the summer and fall of 2016, TREY HOLLADAY and CARTER oversaw improvements to the Linden Hub. The improvements included, but were not limited to: (1) replacing the carpet; (2) replacing some ceiling tiles; and (3) placing new furniture in the facility.

95.     On or about July 21, 2016, the ACS board of education approved the hiring of J.T. to serve as a "digital learning coach/teacher ACS/REN." At all times material to this indictment, J.T. was a resident of Marengo County. At TREY HOLLADAY's direction, J.T. was to be the teacher at the Linden Hub.

96.     During the 2016–2017 school year and the first half of the 2017–2018 school year, J.T. worked for ACS at the Linden Hub. There, she taught eleventh and twelfth grade Advanced Placement English courses to full-time Marengo Academy students.

97.     Additionally, at some points during the relevant period, ACS officials used the Linden Hub to administer state-required standardized tests to full-time private school students.

98.     During the period alleged in this indictment, CORKREN and TUTT were responsible for mowing the grass at the grounds of the Linden Hub.

**5.     Enrollment of Private School Students in Limestone County Virtual School**

99.     In or about July of 2016, TREY HOLLADAY introduced CORKREN and SISK. Around the same time, TREY HOLLADAY told SISK that CORKREN could deliver additional students for the Limestone County Virtual School. TREY HOLLADAY also suggested that CORKREN would be willing to pay money back to SISK if SISK asked CORKREN to do so.

100.    On or about July 29, 2016, Ed Op and LCS entered into a contract. CORKREN signed the contract for Ed Op; Sisk executed it for LCS. The preamble of the contract stated: "[T]here are anticipated to be a significant number of LCVS [Limestone County Virtual School] full-time and guest enrollment students in the Marengo County, Alabama area. . . during the 2016-17 school year" and "EOM [Ed Op] desires to contract with LCS to provide it with such administrative and logistical services in the state of Alabama for homeschooled students that are not enrolled in private schools." In the official contract approved by the LCS board of education, LCS agreed to pay Ed Op $45 per student serviced each month.

101.    Thereafter, CORKREN and SISK verbally modified the agreement. Specifically, they agreed that: (1) CORKREN would find students for the Limestone County Virtual School; and (2) LCS would pay Ed Op $55 per student per month—constituting an extra $10 per student per month than what the contract provided. CORKREN and SISK agreed that CORKREN would set the extra money aside and, at a time and manner requested by SISK, deliver that money to a charity.

102.    In or about August of 2016, CORKREN came into contact with an official of Monroe Academy. CORKREN offered the Monroe Academy official: (1) access to Odysseyware; (2) laptop computers; (3) increased internet capabilities; (4) standardized testing; and (5) monetary payments. In exchange, CORKREN asked the Monroe Academy official to

26

provide student information needed to enroll the Monroe Academy students in the Limestone County Virtual School. As noted, LCS did not have access to Odysseyware. Instead, CORKREN allowed Monroe Academy students to use ACS's Odysseyware license. Monroe Academy officials agreed.

103.    On or about August 26, 2016, the Monroe Academy headmaster completed and signed, on behalf of each student at Monroe Academy: (1) a Limestone County Schools Virtual/Non-Resident Enrollment Form; and (2) what purported to be an AISA Verification Release Form. These forms were similar to the ACS forms signed by other private school officials. The LCS enrollment form template was substantially identical to the ACS enrollment form template. Parents or guardians did not sign the enrollment forms and did not otherwise consent to the transfer of their children's identifying information to LCS.

104.    As TREY HOLLADAY, SISK, and CORKREN then knew, the students named in the LCS enrollment and verification release forms and the parents of those students: (1) did not intend to enroll as full-time public school students for the 2016–2017 school year; and (2) did not intend to un-enroll from Monroe Academy for the 2016–2017 school year.

105.    On or about January 23, 2017, SISK telephoned CORKREN. During the telephone call, SISK asked CORKREN to prepare a modified version of the LCS-Ed Op contract approved by the LCS board of education. SISK asked CORKREN to edit the board-approved contract so as to reflect that LCS owed Ed Op $55 per student. On or about that same date, CORKREN converted a portable data format (hereinafter, "PDF") version of the board-approved, executed contract into a Microsoft Word document. CORKREN then edited the payment provision of the Word document as SISK instructed. CORKREN then converted the edited Word document to a PDF document. Thereafter, CORKREN sent an email message to

SISK's personal email account. Attached to the message was the modified PDF-version of the contract.

### 6. Proposed Contract between ACS and Elba City Schools

106. In or about September of 2016, TREY HOLLADAY and CORKREN went to the central office of the Elba, Alabama City School District (hereinafter, "Elba City Schools") in Elba, Alabama. There, they met with the superintendent, C.T.

107. During the meeting, TREY HOLLADAY asked C.T. if Elba City Schools would be willing to serve as an additional "hub" for Athens Renaissance. Elba is within 100 miles of the Lakeside School in Eufaula. Linden, the location of ACS's Linden Hub, is not within 100 miles of the Lakeside School in Eufaula.

108. TREY HOLLADAY offered that ACS could enter into contracts to pay both Elba City Schools and C.T. TREY HOLLADAY and CORKREN would not require C.T. or Elba City Schools to perform any service for ACS in exchange for receiving money from such contracts.

109. On or about September 11, 2016, TREY HOLLADAY sent an email message to C.T. In the message, TREY HOLLADAY wrote: "We have approximately 150 students within 70 miles of Elba now and plan to add a couple of hundred more next year. So based on 150, you would receive $75,000 next year and if we added 200 more you would receive [ ]$175,000 in 2018-19."

110. For reasons unknown, ACS did not ever make payments to Elba City Schools or to C.T. Elba City Schools did not serve as a hub for ACS during the relevant period.

28

**7.   Calculation of ACS and LCS Average Daily Memberships during the Fall of 2016**

111.   On or about October 14, 2016, officials with the ASDE, from ASDE offices in Montgomery, using wire communications in interstate commerce, caused to be extracted enrollment information from ACS's student information management database. The database reflected that full-time students of Marengo Academy, Jackson Academy, Pickens Academy, the Lakeside School, and Southern Academy had been enrolled as full-time ACS students for some or all of the 20-day period following Labor Day of 2016. In total, ACS's enrollment information included in excess of 750 full-time private school students.

112.   These full-time private school students were, in no way, full-time virtual students of ACS.

113.   On or about October 12, 2016, officials with the ASDE, from ASDE offices in Montgomery, using wire communications in interstate commerce, extracted enrollment information from LCS's student information management database. The database reflected that full-time students of Monroe Academy had been enrolled as full-time LCS students for some or all of the 20-day period following Labor Day of 2016. In total, LCS's enrollment information included in excess of 200 full-time private school students.

114.   These full-time private school students were, in no way, full-time virtual students of LCS.

**8.   Private Schools' Use of Odysseyware and Reporting of Grades**

115.   During the 2016–2017 school year, students at Marengo Academy, Jackson Academy, Pickens Academy, the Lakeside School, Southern Academy, and Monroe Academy used Odysseyware and any other curriculum provided by ACS only to a limited extent.

29

116.    Some students took no elective courses through Odysseyware. Other students took a small number of elective courses through Odysseyware. In most cases, employees of the private schools administered these elective courses in that such employees monitored students' progress while the students worked on the elective courses.

117.    Additionally, some private school teachers occasionally used Odysseyware curriculum to obtain supplemental assignments in traditionally taught courses.

118.    Additionally, as noted, some students at Marengo Academy took Advanced Placement English taught by J.T. at the Linden Hub.

119.    Subject to very few possible exceptions, during the 2016–2017 school year, students at the above-referenced private schools did not take "six (6) credits per year at either the traditional or accelerated pace" through Odysseyware or any other learning management system or curriculum provided by ACS, as required by ACS's Addendum to Policy ILB to be considered full-time virtual students.

120.    After the conclusion of each semester of the 2016–2017 school year, the above-referenced private schools provided to CORKREN copies of report cards pertaining to the preceding semester or, in the case of one school, a single list of all grades earned by every student during the preceding semester. At some point, CARTER instructed CORKREN to modify private school report cards or grade lists to omit the names of private schools. CORKREN then provided those report cards or grade lists (or modified versions of the report cards or grade lists that omitted the name of the private school) to CARTER. CARTER then provided those report cards or grade lists (or modified versions of the report cards or grade lists that omitted the name of the private school) to ACS officials. ACS officials, at CARTER's direction, then loaded the grades reflected on the report cards or grade lists into ACS's student

30

information management database to make it appear that the students had earned the grades in ACS courses. ACS officials, at CARTER's direction, loaded each grade into ACS's student information management database without regard to whether the student earned the grade through a course that utilized an ACS learning management system or instructor or through a course taught by a private school teacher in a traditional manner. ACS officials, at CARTER's direction, then generated official ACS report cards for the private school students containing grades that the private school students earned at their respective private schools.

### 9. Obtaining Private School Parent Signatures on ACS Enrollment Forms

121.    In or about February of 2017, ASDE officials visited the physical campuses of Athens Renaissance. They went to "audit" paperwork associated with Athens Renaissance students.

122.    In connection with the audit, TREY HOLLADAY instructed CORKREN to obtain private school parent signatures on ACS enrollment forms. TREY HOLLADAY did so even though the private school officials had, for almost every student, already signed an ACS enrollment form and even though, at the beginning of the 2016–2017 school year, ACS had purported to enroll each student.

123.    Thereafter, CORKREN asked officials at the private schools whose students were fraudulently enrolled in Athens Renaissance to obtain, from the parents or guardians of their students, signed ACS enrollment forms. In some instances, CORKREN offered for Ed Op to pay and did pay a school a monetary amount for each parent-signed enrollment form the private school provided to him. ACS reimbursed CORKREN for the payments Ed Op made to private schools in exchange for the parent-signed forms.

124.   Private school officials then persuaded parents and guardians to sign ACS enrollment forms. Private school officials caused the signed forms to be delivered to CORKREN.

125.   For example, in or about February of 2017, the headmaster of the Lakeside School sent a United States Mail package from Eufaula, Alabama to Northport, Alabama, the town in which CORKREN resided. Inside the package were ACS enrollment forms signed by Lakeside School parents.

126.   CORKREN then caused the signed forms to be delivered to CARTER. CARTER caused the signed forms to be placed in the ACS files of the private school students.

**10.    Standardized Testing**

127.   In or about the spring of 2017, DEBORAH HOLLADAY and CARTER visited the Linden Hub and other locations to administer state-required standardized tests to the full-time private school students who were fraudulently enrolled in Athens Renaissance.

128.   Also in or about the spring of 2017, CARTER assisted CORKREN and SISK in planning to administer state-required standardized tests to the full-time Monroe Academy students who were fraudulently enrolled in Limestone County Virtual School.

**11.    Introduction of TUTT to the Scheme**

129.   In or about the spring of 2017, TREY HOLLADAY contacted TUTT and invited TUTT to become a participant in the scheme. TUTT's role was, initially, to contact private schools and recruit the private schools to participate in the scheme during the 2017–2018 school year.

32

130. TUTT agreed to participate. Thereafter, at TREY HOLLADAY's direction, Ed Op formed an agreement with Tutt Educational, the company that TUTT formed for the purpose of participating in the scheme.

**12. Payments Made During the 2016–2017 School Year**

131. During the 2016–2017 school year, payments were made in the following manner:

**i. State to ACS and LCS**

132. The state of Alabama made payments through the Foundation Program to ACS and to LCS. These payments were, for the most part, based on the school districts' fall 2015 average daily membership. The making of the payments involved the use of wire communications in interstate commerce.

133. In or about September of 2017, the state of Alabama made a Current Units payment to ACS. This payment was based on the increase in ACS's average daily membership during the fall of 2016. That increase resulted, in large part, from the fraudulent enrollment of full-time private school students. The making of the payment involved the use of wire communications in interstate commerce.

**ii. ACS to Ed Op**

134. ACS made payments to Ed Op. These payments were based on the number of private school students "served" by CORKREN through Ed Op during the preceding month. Between on or about June 1, 2016 and on or about July 31, 2017, CORKREN received and deposited into an Ed Op account payments from ACS having a total value in excess of $500,000.

**iii. LCS to Ed Op**

135. LCS made payments to Ed Op. These payments were based on the number of Monroe Academy students "served" by CORKREN through Ed Op during each month. Between

33

in or about September of 2016 through in or about February of 2017, CORKREN received and deposited into an Ed Op account payments from LCS having a total value in excess of $100,000.

### iv.    Ed Op to Private Schools

136.    CORKREN, through Ed Op, made payments to the following private schools: Marengo Academy, Jackson Academy, Pickens Academy, the Lakeside School, Southern Academy, and Monroe Academy. The total value of the payments from Ed Op to these six private schools exceeded $150,000.

137.    CORKREN, through Ed Op, also made payments to other private schools that CORKREN was trying to induce to provide student information that could be used to fraudulently enroll students into ACS or LCS schools during the next school year.

### v.    Ed Op to CORKREN, TREY HOLLADAY, and CARTER

138.    CORKREN made transfers from the Ed Op account to his own personal account.

139.    CORKREN withdrew United States currency from the Ed Op account and from his own personal account.

140.    On multiple occasions, CORKREN then gave United States currency to TREY HOLLADAY.

141.    On multiple occasions, CORKREN then gave United States currency to CARTER.

142.    CORKREN also paid for the repairs of the personal vehicles of TREY HOLLADAY's and DEBORAH HOLLADAY's children.

### vi.    Ed Op to Tutt Educational

34

143.     Starting in March of 2017, CORKREN made payments from an Ed Op account to Tutt Educational. These payments, made between in or about March of 2017 and in or about July of 2017, had a total value exceeding $20,000.

### vii.    Ed Op to SISK

144.     On or about January 3, 2017, CORKREN wrote a check drawn on an Ed Op account payable to Charity A, a charitable organization with which SISK was affiliated. The check had a value of approximately $15,000. CORKREN did so at the direction of SISK. SISK directed that CORKREN make the payment to Charity A so that Sisk could personally enrich himself with the money paid to Charity A. The amount reflected the extra $10 per student per month that LCS had been paying Ed Op for the preceding months. On or about January 13, 2017, Charity A deposited the check from Ed Op into an account under its control.

145.     On or about January 20, 2017, Charity A, at SISK's direction, wired approximately $13,000 from its account to a personal account of SISK's.

### B.    2017–2018 School Year

### 1.    Establishment of New Money Flow and Participants

146.     Before the beginning of the 2017–2018 school year, TREY HOLLADAY modified the scheme and caused the scheme to be modified in the following ways:

i.      TREY HOLLADAY caused the following: (1) during the 2017–2018 school year, ACS and CCS would make monthly payments to Ed Op; (2) Ed Op would then make monthly payments to Tutt Educational; (3) Tutt Educational would then make monthly payments to Sage, the company owned by DEBORAH HOLLADAY; (4) DEBORAH HOLLADAY would then use money paid to Sage for her own and her family's personal use and

35

would cause funds to move from a Sage account to personal accounts belonging to DEBORAH HOLLADAY and TREY HOLLADAY.

   ii.  TREY HOLLADAY also directed CORKREN that Ed Op should begin making payments directly to private school employees so as to make it appear that private school employees were independent contractors of Ed Op.

  147.  To make these changes, on or about June 28, 2017, TREY HOLLADAY sent an email message, using wire communications in interstate commerce, from his personal email account to CORKREN. The subject of the message was "Stuff." The message contained no text. Attached to the message were four documents, namely:

   i.  A draft agreement between ACS and Ed Op for the 2017–2018 school year. The draft agreement called for ACS to pay Ed Op per month for each student serviced: (1) $60, if Ed Op did not provide services to the student during any part of the 2016–2017 school year; and (2) $200, if Ed Op did provide services to the student during any part of the 2016–2017 school year. The term of the draft agreement was to be from July 1, 2017 through September 30, 2018.

   ii.  A draft agreement between Ed Op and Tutt Educational. The draft agreement called for Tutt Educational to "provide the Chief Executive Officer of Educational Opportunities and Management, LLC. . . with guidance, advise [sic], and assistance concerning various independent-virtual education projects, including innovative education initiatives, personnel management and nontraditional education delivery." Under the draft agreement, Ed Op was to pay Tutt Educational: (1) a monthly payment of $16,500; (2) a student management and professional development fee of $16,500; (3) an internet connectivity fee of $10,000; (4) for 10 months, a site service monthly fee of $24,000; (5) if Ed Op did not provide Tutt Educational

with laptop computers, then a single payment of $135,000; and (6) other approved expenses. The draft agreement was to expire on June 30, 2018.

    iii. A draft agreement between Tutt Educational and Sage. The draft agreement called for Sage to provide "the Chief Executive Officer of Tutt Educational Services, LLC . . . with guidance, advise [sic], and assistance concerning professional development and teacher training." Under the draft agreement, Tutt Educational was to pay Sage a monthly fee of $16,500. The draft agreement was to expire on June 30, 2018.

    iv. A draft agreement template between Ed Op and a "contract teacher." The draft agreement template called for the teacher to provide "student instruction, grading, testing, counseling, reporting, and assistance concerning assigned virtual education students and nontraditional education delivery." Under the draft agreement template, Ed Op was to pay the teacher $200 per student assigned. This would come in two payments. These payments would be distributed on December 15 and May 31 "or upon receipt of the required reports provided to the CEO." The draft agreement template also stated: "Payment to the Teacher will not be distributed until grade reports are received."

  148. On or about June 28, 2017, TREY HOLLADAY, on behalf of ACS, executed the 2017–2018 ACS-Ed Op agreement. CORKREN also executed the agreement for Ed Op on or about the same date. The agreement executed on or about June 28, 2017 was substantially similar to the draft agreement sent by TREY HOLLADAY to CORKREN by email on or about the same date. However, the payment provision of the executed agreement differed from the payment provision of the email attachment draft agreement. The executed agreement called for the following monthly payments per student serviced: (1) $45, if Ed Op did not provide services

to the student during any part of the 2016–2017 school year; and (2) $150, if Ed Op did provide services to the student during any part of the 2016–2017 school year.

149.    In or about July of 2017, DEBORAH HOLLADAY telephoned TUTT and informed TUTT that TUTT would be contracting with Ed Op during the 2017–2018 school year and that TUTT would be required to then make monthly payments to her company.

150.    During the 2017–2018 school year, SISK did not participate in the scheme. Moreover, private school students were not fraudulently enrolled in Limestone County Virtual School during that school year. Additionally, Monroe Academy students were not fraudulently enrolled in a public school district during the 2017–2018 school year.

## 2.    TREY HOLLADAY Assisting CORKREN in Receiving a Loan

151.    In or about July and August of 2017, Ed Op did not have sufficient funds to pay TUTT and the private schools. CORKREN needed funds to meet obligations until ACS began paying Ed Op under the 2017–2018 school year contract.

152.    In or about July and August of 2017, TREY HOLLADAY directed CORKREN to go to First State Bank of the South and apply for a business loan.

153.    In or about August of 2017, CORKREN, on behalf of Ed Op, submitted an application to First State Bank of the South for a $75,000 consumer loan.

154.    On or about August 3, 2017, W.G., a First State Bank of the South official, sent an email message to TREY HOLLADAY. In that message, W.G. asked TREY HOLLADAY to send to him a copy of CORKREN's contract with ACS. Later that day, TREY HOLLADAY sent an email to W.G. In that email, TREY HOLLADAY wrote, "I have attached the service agreement. We currently have 915 students with Ed Op that are Tier 2."

155. Thereafter, First State Bank of the South approved Ed Op's loan application. It did so after CORKREN executed an assignment of the money Ed Op was to receive under its contract with ACS. On or about August 7, 2017, CORKREN deposited into a checking account a $75,000 check from First State Bank of the South constituting loan proceeds.

**3. Enrollment of Abbeville Christian Academy Students in CCS's Genesis Innovative School**

156. On or about an unknown date, TREY HOLLADAY introduced CORKREN to Z.B., the superintendent of CCS. TREY HOLLADAY informed Z.B. that CORKREN could provide students for Genesis Innovative School, CCS's virtual school.

157. On or about July 27, 2017, the CCS board of education voted to approve a contract between CCS and Ed Op for the 2017–2018 school year. The CCS-Ed Op contract was substantially similar to the 2017–2018 ACS-Ed Op contract, except that the CCS-Ed Op contract called for monthly payments of $60 per student serviced. Z.B. signed the contract for CCS. CORKREN signed the contract for Ed Op.

158. In or about June of 2017, TUTT visited the campus of Abbeville Christian Academy. There, he met with the headmaster of the school. TUTT offered the headmaster: (1) access to online curriculum; (2) laptop computers; (3) standardized testing of Abbeville Christian Academy students; and (4) stipend money to be paid to Abbeville Christian Academy teachers. In exchange, TUTT asked the headmaster to provide student information. TUTT did not specify into what public school district the students would be enrolled.

159. The headmaster of Abbeville Christian Academy approved of Abbeville Christian Academy providing student information to TUTT in exchange for various benefits. Accordingly, in or about June of 2017, the headmaster of Abbeville Christian Academy executed an agreement between Abbeville Christian Academy and Tutt Educational. The agreement required that,

39

during the 2017–2018 school year: (1) Tutt Educational would pay Abbeville Christian Academy $800 per month for student internet access; and (2) Tutt Educational would provide Abbeville Christian Academy with 50 laptop computers and 2 charging carts.

160.     In or about July and August of 2017, DEBORAH HOLLADAY went to the campus of Abbeville Christian Academy to train Abbeville Christian Academy teachers on how to use Odysseyware.

161.     In or about August of 2017, CORKREN received from Abbeville Christian Academy student and parent identifying information and student academic records pertaining to full-time 2017–2018 Abbeville Christian Academy students.

162.     In or about September and October of 2017, CORKREN sent to CCS officials copies of the student and parent identifying information and academic records pertaining to Abbeville Christian Academy students that he had received from Abbeville Christian Academy. The CCS officials then used that information to purportedly enroll the Abbeville Christian Academy students as full-time virtual students of Genesis Innovative School.

163.     As TREY HOLLADAY, DEBORAH HOLLADAY, CARTER, CORKREN, and TUTT then knew, the students from Abbeville Christian Academy enrolled in Genesis Innovative School: (1) did not intend to enroll as full-time public school students for the 2017– 2018 school year; and (2) did not intend to un-enroll from Abbeville Christian Academy for the 2017–2018 school year.

## 4.     ASDE Investigation of Fraudulent Enrollment of Private School Students and ACS's Submission of False Documents

164.     On or about August 17, 2017, the state superintendent of education sent a letter to TREY HOLLADAY. The letter stated that ASDE officials had learned, through contact with private school officials, that, "in exchange for enrollment and access to virtual content provided

40

through Athens Renaissance School, the private school is offered a per student allotment as well as a laptop for each student enrolled." The state superintendent suggested that the enrollment of private school students was "in conflict with the Virtual School Law and call[ed] into question the legitimacy of a significant portion of the 2017 funded ADM [average daily membership] reported by ACS." At the conclusion of the letter, the state superintendent stated that the ASDE would "need to consider, among other things, an extrapolation of disallowed ADM [average daily membership] and corresponding consequences in funding."

165. After receiving this letter, TREY HOLLADAY shared it with TUTT. TREY HOLLADAY also discussed the matter, over the telephone and in person, with ASDE officials. During conversations, TREY HOLLADAY insisted that all students purportedly enrolled in Athens Renaissance were taking full course loads through Athens Renaissance. For example, on or about August 18, 2017, in an email message sent to a member of the Alabama board of education, TREY HOLLADAY wrote, "They are taking a full class load from us and we're educating them." As TREY HOLLADAY then knew, this statement was false.

166. During discussions with ASDE officials, TREY HOLLADAY learned that the ASDE had confirmed that, in or about the fall of 2016, ACS had included in its average daily membership report full-time students of the Lakeside School. Accordingly, in or about August of 2017, TREY HOLLADAY instructed CORKREN to discontinue issuing payments to the Lakeside School and informed him that ACS would not be enrolling the Lakeside School students for the 2017–2018 school year.

167. As part of an effort to convince ASDE officials that ACS had educated all of the private school students fraudulently enrolled in Athens Renaissance during the 2016–2017 school year, TREY HOLLADAY instructed CORKREN to obtain and to provide to ACS

41

Odysseyware course completion reports for certain students of Marengo Academy and of the Lakeside School. CORKREN then informed TREY HOLLADAY that such reports would show that the private school students were not taking full course loads through Odysseyware. In response, TREY HOLLADAY directed CORKREN to "handle it." CORKREN understood this to mean that he should falsify such reports so that they would falsely reflect that the students were taking full course loads through Odysseyware. As TREY HOLLADAY and CORKREN then knew, the subject students had not taken full course loads through Odysseyware or any other curriculum provided by ACS during the 2016–2017 school year and any reports reflecting that they had would be false documents.

168.   Per TREY HOLLADAY's instructions, during in or about the fall of 2017, CORKREN prepared such reports. CORKREN then sent the falsified reports to CARTER.

169.   On or about November 17, 2017, CARTER sent an email message to the interim state superintendent of education and the deputy state superintendent of education for the division of administrative and financial services. CARTER copied TREY HOLLADAY on this email message. Attached to the email message were, among other things, 20 falsified Odysseyware course completion reports prepared by CORKREN. Each false report purported to show that the subject student (either a 2016–2017 full-time Lakeside School or Marengo Academy student) had taken a full course load through Odysseyware during the 2016–2017 school year. As CARTER and TREY HOLLADAY then knew, these documents were false. CARTER sent the documents to the ASDE officials for the purpose of causing the ASDE officials to authorize the issuance of full payment from the Education Trust Fund for the private school students fraudulently enrolled in Athens Renaissance during the 2016–2017 school year.

42

170.    In or about March of 2018, the ASDE sent letters to private schools requesting enrollment records so the ASDE could determine whether full-time private school students had been included in ACS's fall 2017 average daily membership report. When he learned about these letters, TREY HOLLADAY, indirectly through, CORKREN and TUTT, instructed the officials of the private schools receiving these letters that the private schools were under no legal to provide the ASDE with the requested data.

### 5.    Enrollment of Private School Students in Athens Renaissance

171.    For the 2017–2018 school year, private school students from Marengo Academy, Jackson Academy, Pickens Academy, and Southern Academy were fraudulently enrolled in Athens Renaissance School. This occurred even though neither the students at those schools nor their parents nor guardians: (1) intended to enroll as full-time public school students for the 2017–2018 school year; or (2) intended to un-enroll from their respective private schools for the 2017–2018 school year.

172.    Additionally, in or about August of 2017, TUTT contacted the headmaster of Meadowview Christian School. TUTT offered the headmaster: (1) access to online curriculum; (2) laptop computers; and (3) money to pay the school's internet bill. In exchange, TUTT asked the headmaster to provide student information. The headmaster accepted TUTT's offer.

173.    Thereafter, in or about August of 2017, DEBORAH HOLLADAY received from Meadowview Christian School information needed to enroll Meadowview Christian School students in Athens Renaissance. DEBORAH HOLLADAY sent this information to CORKREN. CORKREN then sent this information to ACS officials.

174.    In or about August of 2017, a Meadowview Christian School official sent to TUTT copies of independent contractor agreements signed by Meadowview Christian School

43

employees. These agreements purported to make the Meadowview Christian School employees independent contractors of Ed Op. After receiving these documents, TUTT sent them to CORKREN.

175. On or about November 13, 2017, an ACS official purportedly enrolled into Athens Renaissance students who were full-time Meadowview Christian School students. When the ACS official did so, the ACS official backdated the enrollments to, for most students, August 9, 2017. This occurred even though neither the Meadowview Christian School students nor their parents nor guardians: (1) intended to enroll as full-time public school students for the 2017–2018 school year; or (2) intended to un-enroll from Meadowview Christian School for the 2017–2018 school year.

## 6. Calculation of ACS and CCS Average Daily Memberships During Fall 2017

176. On or about October 10, 2017, officials with the ASDE, from ASDE offices in Montgomery, using wire communications in interstate commerce, extracted enrollment information from ACS's student information management database. The database reflected that full-time students of Marengo Academy, Jackson Academy, Pickens Academy, and Southern Academy had been enrolled as full-time ACS students for some or all of the 20-day period following Labor Day of 2017. On or about November 13, 2017, an ACS official modified the database so as to make it appear that full-time students of Meadowview Christian School had been enrolled as full-time ACS students for some or all of the 20-day period following Labor Day of 2017. The ASDE then extracted this November 13, 2017 update. In total, ACS's enrollment information included in excess of 500 full-time private school students.

177. These full-time private school students were, in no way, full-time virtual students of ACS.

44

178.   On or about October 13, 2017, officials with the ASDE, from ASDE offices in Montgomery, using wire communications in interstate commerce, extracted enrollment information from CCS's student information management database. The database reflected that full-time students of Abbeville Christian Academy had been enrolled as full-time CCS students for some or all of the 20-day period following Labor Day of 2017. In total, CCS's enrollment information included in excess of 50 full-time private school students.

179.   These full-time private school students were, in no way, full-time virtual students of CCS.

180.   On or about July 11, 2018, an ACS official withdrew the full-time Meadowview Christian School students from the ACS student information management database and backdated the withdrawals to August 9, 2017.

### 7.   Private Schools' Use of Odysseyware and Reporting of Grades

181.   During the 2017–2018 school year, students at Marengo Academy, Jackson Academy, Pickens Academy, Southern Academy, Meadowview Christian School, and Abbeville Christian Academy used Odysseyware and any other curriculum provided by ACS only to a limited extent.

182.   Some students took no elective courses through Odysseyware. Other students took one or two elective courses through Odysseyware. In most cases, employees of the private schools administered these elective courses in that such employees monitored students' progress while they worked on the elective courses.

183.   Additionally, some private school teachers occasionally used Odysseyware curriculum to obtain supplemental assignments in traditionally taught courses.

184. Additionally, as noted, some students at Marengo Academy took Advanced Placement English taught by J.T. at the Linden Hub.

185. Subject to very few possible exceptions, during the 2017–2018 school year, students at the above-referenced private schools did not take "six (6) credits per year at either the traditional or accelerated pace" through Odysseyware or any other learning management system or curriculum provided by ACS, as required by ACS's Addendum to Policy ILB to be considered full-time virtual students.

186. During the 2017–2018 school year, Jackson Academy, Abbeville Christian Academy, Meadowview Christian School, and Southern Academy provided to CORKREN copies of report cards pertaining to the preceding semester. CORKREN provided modified versions of those report cards to ACS officials, or, in the case of the Abbeville Christian Academy report cards, to CCS officials. Per CARTER's instructions given the previous school year, the report cards were modified to omit the private schools' names. ACS officials, at CARTER's direction, then loaded the grades reflected on the report cards from Jackson Academy and Southern Academy into ACS's student information management database so as to make it appear that the students had earned the grades in ACS courses. ACS officials, at CARTER's direction, loaded each grade into ACS's student information management database without regard to whether the student earned the grade through a course that utilized an ACS learning management system or instructor or through a course taught by a private school teacher in a traditional manner. ACS officials, at CARTER's direction, then generated official ACS report cards for the private school students containing grades that the private school students earned at their respective private schools. CCS officials loaded the Abbeville Christian Academy grades into CCS's student information management database in a similar manner.

**8. Standardized Testing**

187. During in or about the spring of 2018, CARTER scheduled the administration of standardized tests of private school students enrolled in Jackson Academy, Southern Academy, and Meadowview Christian School. On or about April 10, 2018, CARTER sent the test schedules to CORKREN by email. When he did so, CARTER instructed CORKREN to "[p]lease notify students." On or about the same date, CORKREN sent the test schedules to TUTT. On or about the same date, TUTT sent the test schedules to DEBORAH HOLLADAY.

188. In or about April and May of 2018, DEBORAH HOLLADAY went to Jackson and Greensboro to administer the standardized tests to the full-time private school students.

189. At various times, DEBORAH HOLLADAY sent United States Mail packages containing standardized testing materials.

190. On or about January 26, 2018, DEBORAH HOLLADAY sent a package via first-class mail from Athens to Tuscaloosa. Written on the receipt associated with the transaction were the words, "Mailed testing."

191. On or about March 9, 2018, DEBORAH HOLLADAY sent via the United States Mail packages from Athens to Marion, Jackson, Greensboro, and Selma.

**9. Efforts to Form Alabama Renaissance and Payments to Company A**

192. In or about the summer of 2017, TREY HOLLADAY and CARTER began efforts to convert a portion of Athens Renaissance into a charter school. They wanted Athens Renaissance to remain a virtual school of ACS serving only students who resided within Athens and nearby areas. They wanted to create a new charter school that would serve students who resided outside of the area near Athens—including the private school students. The name of this charter school would be Alabama Renaissance.

47

193. On or about an unknown date, TREY HOLLADAY verbally explained to an ACS employee that if ACS were able to convert a portion of Athens Renaissance into a charter school that new charter school would be subject to less state oversight than Athens Renaissance. During that conversation, TREY HOLLADAY said, when discussing the level of control ACS would have over a charter school it authorized, "We don't have to deal with the state; we, we run, we are the state department at that point in time."

194. Under the plan devised by TREY HOLLADAY, CARTER, and Company A officials: (1) ACS would authorize Alabama Renaissance pursuant to ACS's power as a charter school authorizer; (2) Alabama Renaissance would be under the control of a board that was separate from the ACS board of education—the board of the Athens City Schools Foundation, a non-profit organization supporting ACS; (3) the Athens City Schools Foundation would then contract back with ACS for ACS to operate Alabama Renaissance; and (4) either ACS or the Athens City Schools Foundation would hire Company A to manage Alabama Renaissance.

195. On or about August 3, 2017, the ACS board of education held a special meeting and, during that meeting, selected Company A to operate Alabama Renaissance. Thereafter, on or about October 1, 2017, ACS entered into a contract with Company A.

196. Under the contract, Company A would recruit students for Alabama Renaissance and provide "comprehensive management." The contract required ACS to pay Company A up to \$29,587.50 monthly and \$355,050 annually. After ACS and Company A entered into the October 1, 2017 contract, TREY HOLLADAY, DEBORAH HOLLADAY, CARTER, and TUTT began efforts to persuade private school officials to: (1) dissolve their existing private schools; (2) reconstitute as non-profit homeschool associations; and (3) allow the students of the new homeschool associations to be enrolled in Alabama Renaissance. The above-named co-

48

conspirators explained to private school officials that the effect of making these changes would be: (1) the new homeschool associations would be able to use virtual education curriculum; (2) the new homeschool associations would receive even more money from the state, through ACS and other entities, than they had been previously receiving (if the school had previously provided student information to ACS and received money for doing so); (3) the homeschool associations would still be able to collect tuition, in the form of "fees" or "donations," from students, would still be able to offer non-secular elective courses, would still be able to maintain brick-and-mortar campuses, and would otherwise still be able to, for the most part, function as they had as private schools. The below-named co-conspirators made the following efforts to recruit specific private schools:

### i. Marion Academy

197. During in or about the fall of 2017, TUTT visited Marion Academy and asked officials at Marion Academy to consider associating with ACS. TUTT mentioned that Meadowview Christian School and Marengo Academy were already associated.

198. On or about October 19, 2017, DEBORAH HOLLADAY and TREY HOLLADAY met with officials of Marion Academy at a fast-food restaurant in Marion, Alabama. There, they attempted to recruit Marion Academy officials to participate in the above-described scheme.

199. In or about January of 2018, TREY HOLLADAY, DEBORAH HOLLADAY, CARTER, CORKREN, and TUTT went to Marion and met with the Marion Academy board of directors. During that meeting, TREY HOLLADAY tried to convince the board to participate in the scheme.

49

200.    In or about January of 2018, CORKEN delivered computers to the campus of Marion Academy. These computers were purchased by ACS and constituted the property of ACS. Also in or about January of 2018, CORKREN sent to a Marion Academy official Odysseyware usernames and passwords for the Marion Academy students. ACS paid for the Marion Academy students' access to Odysseyware.

201.    In or about February of 2018, CARTER delivered additional computers to Marion Academy after the computers brought by CORKREN did not work well. These computers were purchased by ACS and constituted the property of ACS.

202.    On or about March 6, 2018, the Marion Academy board of directors voted to approve a partnership with ACS. At the board meeting, the Marion Academy headmaster informed the board that DEBORAH HOLLADAY was working to recruit home-schooled students.

203.    In or about April of 2018, the Marion Academy board chairman sent a letter to TREY HOLLADAY. The letter stated that Marion Academy would soon "no longer exist as a private school" and was "asking Athens City Schools to consider assisting our former students with their academic needs. This could be accomplished by allowing students to enroll as full time students in the Athens City Schools Public Conversion Charter School until such time that other services, such as a startup charter school, are available to them." This letter did not accurately reflect the financial status of Marion Academy in that the school was not about to close. The board chairman sent the letter at the direction of the co-conspirators.

204.    In or about May of 2018, Marion Academy undertook the legal process of changing its name from "Marion Academy" to "Marion Home School Foundation." Marion Academy did so at the direction of the co-conspirators.

50

205.    During in or about June and July of 2018, TUTT made efforts to recruit students
for Marion Academy for the 2018–2019 school year. By that time, Marion Academy was
operating under the name Marion Home School Foundation.

### ii.    Southern Academy

206.    On or about February 5, 2018, CARTER went to the campus of Southern
Academy and made a charter school presentation. When requesting authorization from ACS to
go to Southern Academy, CARTER informed ACS officials that he would be: "Presenting to
potential partners for inspiring and facilitating change Using Alabama Renaissance."

207.    Southern Academy officials informed CARTER that the school was not interested
in making the changes that would be necessary for it to enroll its students in Alabama
Renaissance.

### iii.    Jackson Academy

208.    On or about November 9, 2017, TREY HOLLADAY, DEBORAH HOLLADAY,
CARTER, CORKREN, and TUTT met with Jackson Academy officials at a restaurant in
Orrville, Alabama. During the meeting, the above-named co-conspirators attempted to persuade
the Jackson Academy officials to make the changes required to participate in Alabama
Renaissance during the 2018–2019 school year.

209.    In or about March and April of 2018, TREY HOLLADAY, DEBORAH
HOLLADAY, CARTER, and TUTT met with officials of Jackson Academy and attempted to
persuade them to participate in the above-described scheme.

210.    In or about March of 2018, Jackson Academy was experiencing financial
difficulties. In or about that month, a Jackson Academy official asked TUTT if TUTT and ACS
would be willing to make a donation to Jackson Academy.

211. In or about March of 2018, the Jackson Academy headmaster, the Jackson Academy board chairman, and a Jackson Academy board member met for dinner at a Birmingham, Alabama restaurant with TREY HOLLADAY, CARTER, and TUTT. During that dinner, TREY HOLLADAY informed the Jackson Academy officials that ACS would only be able to make a donation to Jackson Academy if Jackson Academy officials sent a letter to ACS informing ACS that Jackson Academy intended to cease operations. TREY HOLLADAY advised the Jackson Academy officials that the school would not actually have to cease operations to receive the funding from ACS so long as they signed such a letter saying that they would do so. TREY HOLLADAY stated that the signing of the letter would have no effect on the ongoing operations of Jackson Academy.

212. During or before the dinner of in or about March of 2018, the Jackson Academy board chairman signed a letter addressed to TREY HOLLADAY. The letter stated that Jackson Academy had "exhaust[ed] its resources for its ongoing operations beyond March 2018." The letter then stated that the Jackson Academy board intended to close as a private school. The letter concluded as follows: "I ask that Athens City Schools consider assisting by enrolling and servicing any former Jackson students that wish to enroll as an Athens City School's full-time, virtual/blended student until other such services like a charter school are available. Choice is important in any person's educational endeavor and we believe Athens is one of many choices with regards to their educational needs."

213. After the Jackson Academy board chairman signed the letter, he gave it to TREY HOLLADAY. TREY HOLLADAY later sent electronic copies of it to, among other people: CARTER and an employee of the office of the governor of Alabama.

52

214. On March 16, 2018, TREY HOLLADAY and CARTER caused ACS to make a payment of $45,000 to Company A. On the same date, Company A submitted to ACS an invoice requesting the $45,000 payment. The invoice did not reflect actual costs incurred by Company A or money owed to Company A. It purported to seek $45,000 for: "Planning and Enhancements in preparation for teacher and student use at satellite facilities; and recruitment and development of staff for development and implementation of Digital Curriculum for the remainder of the 2017-2018 fiscal year." CARTER instructed Company A officials as to what language should appear on the invoice.

215. On or about March 19, 2018, TUTT, for Tutt Educational, submitted to Company A an invoice requesting $30,000. The invoice did not reflect actual costs incurred by Tutt Educational or money owed to Tutt Educational. On or about March 20, 2018, Company A made a $30,000 payment to Tutt Educational. Company A did so at the direction of CARTER.

216. On or about March 20, 2018, TUTT then, on the instructions of TREY HOLLADAY, caused Tutt Educational to make a $30,000 payment to Jackson Academy.

### iv. Camden Christian Academy

217. On or about January 8, 2018, officials of Camden Christian Academy met with TREY HOLLADAY, CARTER, and an official of Company A at a restaurant in Montgomery. During that meeting, CARTER offered that Camden Christian Academy could become an accredited school under the ACS accreditation if Camden Christian Academy would enroll its students in Alabama Renaissance.

218. Thereafter, on or about an unknown date, CARTER went to the campus of Camden Christian Academy. There, he met with Camden Christian Academy officials. During that meeting, CARTER offered the Camden Christian Academy officials inducements if Camden

53

Christian Academy would provide student information that could be used to enroll students in Alabama Renaissance. CARTER offered: (1) laptop computers; (2) internet hotspots that could be placed in the homes of Camden Christian Academy students; and (3) access to online curriculum. CARTER also offered that ACS would pay the salaries of Camden Christian Academy's teachers. CARTER informed the Camden Christian Academy officials that, if the school affiliated with Alabama Renaissance, the school could: (1) maintain its brick-and-mortar campus; (2) continue to collect tuition from students; and (3) continue to offer religious instruction to its students.

219. On or about an unknown date, CARTER sent a Camden Christian Academy official a copy of a draft letter from the Camden Christian Academy official declaring that Camden Christian Academy had exhausted its funds and was about to close. CARTER asked the Camden Christian Academy official to edit the letter and send it back to him. The Camden Christian Academy official did not edit, sign, or return the letter because the letter did not accurately reflect Camden Christian Academy's financial status—the school was not, in fact, on the brink of closure.

### v. Meadowview Christian School

220. On or about November 9, 2017, CARTER went to the campus of Meadowview Christian School and made a charter school presentation.

221. Meadowview Christian School officials informed CARTER that the school was not interested in making the changes that would be necessary for it to enroll its students in Alabama Renaissance.

### 10. Failure of Alabama Renaissance and Efforts to Continue the Scheme

222.    In or about July of 2018, the state superintendent of education informed TREY

HOLLADAY that ACS did not have the authority to authorize a charter school that would

operate statewide. Accordingly, plans to form Alabama Renaissance and enroll what were, in

effect, private school students, were abandoned.

223.    Thereafter, TREY HOLLADAY and CARTER attempted to enroll full-time

Marion Academy students in Athens Renaissance for the 2018–2019 school year.

224.    On or about August 13, 2018, CARTER went to the campus of Marion Academy

to train Marion Academy teachers.

225.    On or about August 14, 2018, TREY HOLLADAY sent an email message to an

ASDE official. In that email message, TREY HOLLADAY wrote:

> I've got a virtual question that I need answered/verified before I can enroll about
> 45 students.
>
> I have a letter from the board president of Marion Academy that states they have
> closed there [sic] private school and the students want to enroll in Athens
> Renaissance. I need to ensure that the [ASDE] is good with us accepting these
> students prior to enrolling. I am forwarding this letter to you to verify that we are
> good to move forward. As I understand, a parent group has formed as a home
> school support group for these students and for activities. The majority of these
> students are African-American. Additionally, Judson College is offering free dual
> enrollment classes for these students and we want to make sure we have an
> articulation agreement in place.
>
> Thank you and I look forward to hearing from you soon!
>
> Trey

As TREY HOLLADAY then knew, Marion Academy had not closed at the time he sent this

email message.

226.    On or about August 17, 2018, the ASDE official responded to TREY

HOLLADAY's message of on or about August 14, 2018. The ASDE official noted that the

55

Marion Academy website indicated that classes were to begin on Monday, August 20, 2018. The official asked TREY HOLLADAY, "How can classes start on Monday if the school is closed?"

227. In or about May of 2018, TUTT went to CCS offices in Evergreen and offered to recruit private schools to enroll their students in Genesis Innovative School for the 2018–2019 school year. CCS officials agreed to allow TUTT to recruit private schools. TREY HOLLADAY encouraged TUTT to attempt to recruit private school students for CCS.

228. In or about June of 2018, TUTT and a CCS official went to the campus of Abbeville Christian Academy and attempted to persuade Abbeville Christian Academy officials to provide student information that could be used to fraudulently enroll Abbeville Christian Academy students in Genesis Innovative School for the 2018–2019 school year.

229. In or about June of 2018, TUTT and a CCS official went to the campus of Meadowview Christian School and attempted to persuade Meadowview Christian School officials to provide student information that could be used to fraudulently enroll Meadowview Christian School students in Genesis Innovative School for the 2018–2019 school year.

230. In or about June of 2018, TUTT and a CCS official went to the campus of Jackson Academy and attempted to persuade Jackson Academy officials to provide student information that could be used to fraudulently enroll Jackson Academy students in Genesis Innovative School for the 2018–2019 school year.

**11. Payments Made During the 2017–2018 School Year**

231. During the 2017–2018 school year, payments were made in the following manner:

    **i. State to ACS and CCS**

232.    The state of Alabama made payments through the Foundation Program to ACS and to CCS. These payments were, for the most part, based on the school districts' fall 2016 average daily membership.

233.    During the 2017–2018 school year, the ASDE reviewed the possibility that ACS had falsely inflated the number of full-time virtual students enrolled in Athens Renaissance during the fall of 2016. In connection with this inquiry, the ASDE withheld some funding otherwise due to ACS for its enrollment of students during the fall of 2016. Due to this withholding, the virtual students enrolled in Athens Renaissance during the fall of 2016 only earned for ACS approximately 75 percent of what they would have otherwise earned but for the withholding.

234.    The making of the payments from the state to ACS and CCS involved the use of wire communications in interstate commerce.

## ii.    ACS to Ed Op

235.    ACS made payments to Ed Op. These payments were based on the number of private school students "served" by CORKREN through Ed Op during the preceding month. Between in or about September of 2017 and in or about June of 2018, CORKREN received and deposited into an Ed Op account payments from ACS having a total value in excess of $1,000,000.

## iii.    ACS to Company A

236.    ACS made payments to Company A. Between in or about October of 2017 and in or about August of 2018, Company A received and deposited into a Company A account checks from ACS having a total value in excess of $340,000.

## iv.    CCS to Ed Op

57

237.    CCS made payments to Ed Op. These payments were based on the number of

private school students "served" by CORKREN through Ed Op. Between in or about February

of 2018 and in or about August of 2018, CORKREN received and deposited into an Ed Op

account payments from CCS having a total value in excess of $10,000.

### v.    Ed Op to Tutt Educational

238.    CORKREN, though Ed Op, made payments to Tutt Educational. Between in or

about August of 2017 and in or about June of 2018, Ed Op made payments to Tutt Educational

having a total value in excess of $580,000.

### vi.    Ed Op to Private Schools

239.    CORKREN, through Ed Op, made payments to the following private schools:

Jackson Academy, Southern Academy, and Meadowview Christian School. The total value of

the payments from Ed Op to these 3 private schools exceeded $25,000.

### vii.    Ed Op to Private School Employees

240.    CORKREN, through Ed Op, made payments to employees of the following

private schools: Jackson Academy, Southern Academy, Meadowview Christian School, and

Abbeville Christian Academy.

### viii.    Ed Op to CORKREN, TREY HOLLADAY, and CARTER

241.    CORKREN made transfers from the Ed Op account to his own personal account.

242.    CORKREN withdrew United States currency from the Ed Op account and from

his own personal account.

243.    On multiple occasions, CORKREN then gave United States currency to TREY

HOLLADAY. On multiple occasions, CORKREN also gave United States currency to

CARTER.

58

244.    CORKREN also paid for the repairs of the personal vehicles of TREY

HOLLADAY's and DEBORAH HOLLADAY's children.

### ix.    Company A to Tutt Educational

245.    As noted, in or about March of 2018, Company A made one payment to Tutt

Educational having a total value of approximately $30,000.

### x.    Tutt Educational to Sage

246.    Tutt Educational made payments to Sage.  Between in or about August of 2017

and June of 2018, Tutt Educational made payments having a total value in excess of $160,000.

### xi.    Tutt Educational to Private Schools

247.    Tutt Educational made payments to the following private schools: Marengo

Academy, Jackson Academy, Pickens Academy, the Lakeside School, Southern Academy,

Monroe Academy, Meadowview Christian School, Abbeville Christian Academy, and Marion

Academy.  The total value of the payments to these schools exceeded $280,000.

### xii.    Tutt Educational to TUTT

248.    Tutt Educational made transfers from a Tutt Educational account to the personal

accounts of TUTT.

### xiii.    Sage to DEBORAH HOLLADAY

249.    Sage made transfers from Sage accounts to the personal accounts of TREY

HOLLADAY and DEBORAH HOLLADAY.

250.    Sage made expenditures from the Sage account that went to the personal use of

TREY HOLLADAY and DEBORAH HOLLADAY.

### xiv.    Sage to Private Schools

251. Sage also made payments to Southern Academy and an employee of Southern Academy.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

252. In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Middle District of Alabama and elsewhere:

253. The factual allegations contained in paragraphs 66 through 69, 71, 74 through 77, 82 through 85, 88, 90 through 95, 99 through 103, 105 through 109, 120, 122, 123, 126 through 130, 136 through 145, 147 through 149, 152 through 158, 160, 162, 165 through 174, 186 through 191, 197 through 201, 205, 206, 208, 209, 211, 213 through 220, 223 through 225, 227 through 230, 238 through 244, and 246 through 251 of count 1 this indictment are hereby realleged and incorporated herein as if copied verbatim.

254. On or about October 19, 2016, in Winston County, Alabama, CORKREN met TREY HOLLADAY. During that meeting, CORKREN delivered to TREY HOLLADAY a quantity of United States currency. The United States currency constituted the proceeds of the wire and mail fraud conspiracy.

255. On or about June 2, 2017, in Pike County, within the Middle District of Alabama, CORKREN met CARTER. During that meeting, CORKREN delivered to CARTER a quantity of United States currency. The United States currency constituted the proceeds of the wire and mail fraud conspiracy.

256. On or about November 9, 2017, in Dallas County, Alabama, during a visit to the residence of a family member of TREY HOLLADAY, CORKREN delivered to CARTER and to

60

TREY HOLLADAY each quantities of United States currency. The United States currency

constituted the proceeds of the wire and mail fraud conspiracy.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2–92
(Wire Fraud)

257.    The factual allegations contained in each of the foregoing paragraphs of this

indictment are hereby realleged and incorporated herein as if copied verbatim.

258.    Between in or about February of 2016 and continuing until in or about August of

2018, in Montgomery County, within the Middle District of Alabama, and elsewhere, the

defendants,

WILLIAM LEE HOLLADAY, III a/k/a "Trey,"
DEBORAH IRBY HOLLADAY a/k/a "Deb," and
WILLIAM RICHARD CARTER, JR. a/k/a "Rick,"

with the intent to defraud, knowingly and willfully devised, and attempted to devise, and

participated in, with knowledge of its fraudulent nature, a scheme and artifice to defraud, and to

obtain money and property by means of materially false and fraudulent pretenses,

representations, and promises.

## MANNER AND MEANS

259.    The factual allegations contained in the manner and means section of count 1 of

this indictment are hereby realleged and incorporated herein as if copied verbatim.

## WIRE COMMUNICATIONS

260.    On or about October 14, 2016, in Montgomery County, within the Middle District

of Alabama, and elsewhere, for the purpose of executing the scheme and artifice to defraud and

for obtaining money and property by false and fraudulent pretenses, representations, and

promises, and attempting to do so, the defendants,

61

WILLIAM LEE HOLLADAY, III a/k/a "Trey" and
WILLIAM RICHARD CARTER, JR. a/k/a "Rick,"

knowingly transmitted, caused to be transmitted, and aided and abetted the transmission of wire

communications in interstate commerce, to wit: the extraction of stored student information data

about particular full-time private school students by ASDE officials for the purpose of

calculating the average daily membership of ACS during the 20 school days following Labor

Day of 2016, with each fraudulently enrolled full-time private school student giving rise to a

separate count:

| COUNT | STUDENT | STUDENT'S ACTUAL PRIVATE SCHOOL |
|-------|---------|----------------------------------|
| 2 | J.M. | Marengo Academy |
| 3 | M.G. | Marengo Academy |
| 4 | C.D. | Marengo Academy |
| 5 | W.D. | Marengo Academy |
| 6 | C.E. | Marengo Academy |
| 7 | J.Br. | Marengo Academy |
| 8 | S.O. | Marengo Academy |
| 9 | E.S. | Marengo Academy |
| 10 | J.Be. | Marengo Academy |
| 11 | E.M. | Jackson Academy |
| 12 | H.M. | Jackson Academy |
| 13 | J.K. | Jackson Academy |
| 14 | J.G. | Jackson Academy |
| 15 | J.P. | Jackson Academy |

| 16 | R.S. | Jackson Academy |
| 17 | W.F. | Jackson Academy |
| 18 | Sk.S. | Jackson Academy |
| 19 | Sh.S. | Jackson Academy |
| 20 | A.M. | Pickens Academy |
| 21 | C.R. | Pickens Academy |
| 22 | J.R. | Pickens Academy |
| 23 | J.M. | Pickens Academy |
| 24 | L.D. | Pickens Academy |
| 25 | O.L. | Pickens Academy |
| 26 | R.H. | Pickens Academy |
| 27 | T.C. | Pickens Academy |
| 28 | A.M. | Pickens Academy |
| 29 | A.D. | The Lakeside School |
| 30 | H.S. | The Lakeside School |
| 31 | D.B. | The Lakeside School |
| 32 | J.F. | The Lakeside School |
| 33 | J.W. | The Lakeside School |
| 34 | L.G. | The Lakeside School |
| 35 | M.C. | The Lakeside School |
| 36 | A.M. | The Lakeside School |
| 37 | M.C. | Southern Academy |
| 38 | N.A. | Southern Academy |

| 39 | C.D. | Southern Academy |
| 40 | B.H. | Southern Academy |
| 41 | A.A. | Southern Academy |
| 42 | A.H. | Southern Academy |
| 43 | A.D. | Southern Academy |
| 44 | J.P. | Southern Academy |

261.    On or about October 10, 2017, in Montgomery County, within the Middle District of Alabama, and elsewhere, for the purpose of executing the scheme and artifice to defraud and for obtaining money and property by false and fraudulent pretenses, representations, and promises, and attempted to do so, the defendants,

WILLIAM LEE HOLLADAY, III a/k/a "Trey" and
WILLIAM RICHARD CARTER, JR. a/k/a "Rick,"

knowingly transmitted, caused to be transmitted, and aided and abetted the transmission of wire communications in interstate commerce, to wit: the extraction of stored student information data about particular full-time private school students by ASDE officials for the purpose of calculating the average daily membership of ACS during the 20 school days following Labor Day of 2017, with each fraudulently enrolled full-time private school student giving rise to a separate count:

| COUNT | STUDENT | STUDENT'S ACTUAL PRIVATE SCHOOL |
| --- | --- | --- |
| 45 | J.M. | Marengo Academy |
| 46 | M.G. | Marengo Academy |
| 47 | C.D. | Marengo Academy |

| 48 | W.D. | Marengo Academy |
| 49 | C.E. | Marengo Academy |
| 50 | J.Br. | Marengo Academy |
| 51 | S.O. | Marengo Academy |
| 52 | E.S. | Marengo Academy |
| 53 | J.Be. | Marengo Academy |
| 54 | E.M. | Jackson Academy |
| 55 | H.M. | Jackson Academy |
| 56 | J.K. | Jackson Academy |
| 57 | J.G. | Jackson Academy |
| 58 | J.P. | Jackson Academy |
| 59 | R.S. | Jackson Academy |
| 60 | Sk.S. | Jackson Academy |
| 61 | Sh.S. | Jackson Academy |
| 62 | W.F. | Jackson Academy |
| 63 | R.A. | Pickens Academy |
| 64 | C.R. | Pickens Academy |
| 65 | J.R. | Pickens Academy |
| 66 | J.M. | Pickens Academy |
| 67 | L.D. | Pickens Academy |
| 68 | O.L. | Pickens Academy |
| 69 | R.H. | Pickens Academy |
| 70 | A.M. | Pickens Academy |

| 71 | M.C. | Southern Academy |
| 72 | A.N. | Southern Academy |
| 73 | J.B. | Southern Academy |
| 74 | B.H. | Southern Academy |
| 75 | A.A. | Southern Academy |
| 76 | A.H. | Southern Academy |
| 77 | A.D. | Southern Academy |
| 78 | J.P. | Southern Academy |

262. On or about November 13, 2017, in Montgomery County, within the Middle

District of Alabama, and elsewhere, for the purpose of executing the scheme and artifice to

defraud and for obtaining money and property by false and fraudulent pretenses, representations,

and promises, and attempted to do so, the defendants,

> WILLIAM LEE HOLLADAY, III a/k/a "Trey,"
> DEBORAH IRBY HOLLADAY a/k/a "Deb," and
> WILLIAM RICHARD CARTER, JR. a/k/a "Rick,"

knowingly transmitted, caused to be transmitted, and aided and abetted the transmission of wire

communications in interstate commerce, to wit: the extraction of stored student information data

about particular full-time private school students by ASDE officials for the purpose of

calculating the average daily membership of ACS during the 20 school days following Labor

Day of 2017, with each fraudulently enrolled full-time private school student giving rise to a

separate count:

| COUNT | STUDENT | STUDENT'S ACTUAL PRIVATE SCHOOL |
|-------|---------|--------------------------------|
| 79 | C.S. | Meadowview Christian School |
| 80 | K.H. | Meadowview Christian School |
| 81 | N.F. | Meadowview Christian School |
| 82 | B.H. | Meadowview Christian School |
| 83 | N.S. | Meadowview Christian School |

263. On or about the dates listed below, in the locations listed below, within the

Middle District of Alabama, and elsewhere, for the purpose of executing the scheme and artifice

to defraud and for obtaining money and property by false and fraudulent pretenses,

representations, and promises, the below-listed defendants knowingly transmitted, caused to be

transmitted, and attempted to do so, and aided and abetted the transmission of wire

communications in interstate commerce, to wit: the transmission of email messages in

furtherance of the scheme and artifice to defraud, with each email message giving rise to a

separate count:

| COUNT | ON OR ABOUT DATE | DEFENDANT CHARGED | DESCRIPTION OF EMAIL MESSAGE | LOCATION MESSAGE SENT OR RECEIVED |
|-------|------------------|-------------------|------------------------------|-----------------------------------|
| 84 | April 18, 2016 | TREY HOLLADAY | Message from TREY HOLLADAY's ACS email account to D.B., the | Received in Barbour County. |

| | | | headmaster of the Lakeside School having a subject of "Re: Lakeside School," stating in part, "We can accommodate your request. We are still working on a pricing model, but we believe that we can do it at a very reasonable per student price. The AP classes may cost more, but we won't know until we know which classes are needed." | . |
|---|---|---|---|---|
| 85 | November 30, 2016 | TREY HOLLADAY | Message from TREY HOLLADAY's ACS email account to C.T., the Elba City Schools superintendent, stating that he was attaching a draft consulting contract "for the work you are providing ACS outside of your regular position in order for us to be successful in providing educational services for students in southeast Alabama." | Received in Coffee County. |

| 86 | February 24, 2017 | CARTER | Message from CARTER'S ACS email account to L.H., an Athens Renaissance guidance counselor, DEBORAH HOLLADAY, and CORKREN having the subject of "Re: EOs," instructing them that, among other things, "Mr. Corkren will finalize report cards for all his EO's in the next week or so." | Sent from Montgomery County. |
| 87 | August 1, 2017 | DEBORAH HOLLADAY | Message from DEBORAH HOLLADAY's Gmail email account to M.C., the headmaster of Abbeville Christian Academy, having the subject of "Welcome Letter," containing no text, but a draft letter to parents from school officials, stating, in part, "For the new school year, <ACADEMY NAME> has contracted with an educational service provider (ESP) for its broad catalog of award-winning, standards-based online curriculum | Received in Henry County. |

| | | | and courses that will be used by our teachers to supplement when needed instruction and course content." | |
|---|---|---|---|---|
| 88 | August 22, 2017 | TREY HOLLADAY | Message from TREY HOLLADAY's ACS email account to an ASDE official, E.T., having a subject of "Re: Contested Students," and stating, in part, "We will bring those items to show that everything was done on our part to follow the law and the [ASDE] guidelines from this past March." | Received in Montgomery County. |
| 89 | August 24, 2017 | TREY HOLLADAY | Message from TREY HOLLADAY's ACS email account to the state superintendent of education's chief of staff having a subject of "Draft Protocols" and listing steps TREY HOLLADAY was considering taking to "secure [ACS's] program[.]" | Received in Montgomery County. |

| 90 | November 17, 2017 | CARTER | Message from CARTER's ACS email account to the deputy state superintendent of education for the division of administrative and financial services having the subject "Requested Information on Virtual," containing ACS's response to ASDE's request for documents relating to Athens Renaissance, including false Odysseyware reports. | Received in Montgomery County. |
|---|---|---|---|---|
| 91 | November 17, 2017 | TREY HOLLADAY | Message from TREY HOLLADAY's ACS email account to an ASDE official, J.L., having the subject line, "Fwd: Requested Information on Virtual," containing a forwarded copy of CARTER's email message of the same date to the deputy state superintendent of education for the division of administrative and financial services.C | Received in Montgomery County. |

| 92 | December 7, 2017 | CARTER | Message from CARTER's ACS email account to an Alabama Senate staff person having the subject "Athens City Schools Assistance Needed," stating, among other things, "we have taken measures in the current school year to prevent private school enrollees from participating in our full-time programs (even though many legislators support it, there is no law prohibiting it and [ASDE] has not issued any guidance against it)." | Received in Montgomery County. |

Each in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS 93–127
(Aggravated Identity Theft)

264.    The factual allegations contained in each of the foregoing paragraphs of this indictment are hereby realleged and incorporated herein as if copied verbatim.

265.    On or about October 14, 2016, in Montgomery County, within the Middle District of Alabama, and elsewhere, the below-listed defendants, aiding and abetting each other, knowingly used, without lawful authority, the means of identification of other persons during and in relation to a felony violation enumerated in Title 18, United States Code, Section

72

1028A(c), to wit: the offenses in this indictment identified as related counts below, knowing that the means of identification belonged to another actual person, that is, they knowingly used the names of actual persons known to the grand jury, listed by their initials below, to commit wire fraud, with the use of each name giving rise to a separate count:

| COUNT | DEFENDANT(S) CHARGED | RELATED WIRE FRAUD COUNT | VICTIM |
|-------|----------------------|--------------------------|--------|
| 93 | TREY HOLLADAY, CARTER, and CORKREN | 9 | E.S. |
| 94 | TREY HOLLADAY and CARTER | 11 | E.M. |
| 95 | TREY HOLLADAY and CARTER | 12 | H.M. |
| 96 | TREY HOLLADAY and CARTER | 13 | J.K. |
| 97 | TREY HOLLADAY and CARTER | 14 | J.G. |
| 98 | TREY HOLLADAY and CARTER | 15 | J.P. |
| 99 | TREY HOLLADAY and CARTER | 16 | R.S. |
| 100 | TREY HOLLADAY and CARTER | 17 | W.F. |

| 101 | TREY HOLLADAY and CARTER | 18 | Sk.S. |
|---|---|---|---|
| 102 | TREY HOLLADAY and CARTER | 19 | Sh.S. |
| 103 | TREY HOLLADAY and CARTER | 20 | A.M. |
| 104 | TREY HOLLADAY and CARTER | 21 | C.R. |
| 105 | TREY HOLLADAY and CARTER | 22 | J.R. |
| 106 | TREY HOLLADAY and CARTER | 23 | J.M. |
| 107 | TREY HOLLADAY and CARTER | 24 | L.D. |
| 108 | TREY HOLLADAY and CARTER | 25 | O.L. |
| 109 | TREY HOLLADAY and CARTER | 26 | R.H. |
| 110 | TREY HOLLADAY and CARTER | 27 | T.C. |
| 111 | TREY HOLLADAY and CARTER | 28 | A.M. |

| 112 | TREY HOLLADAY and CARTER | 29 | A.D. |
| --- | --- | --- | --- |
| 113 | TREY HOLLADAY and CARTER | 30 | H.S. |
| 114 | TREY HOLLADAY and CARTER | 31 | D.B. |
| 115 | TREY HOLLADAY and CARTER | 32 | J.F. |
| 116 | TREY HOLLADAY and CARTER | 33 | J.W. |
| 117 | TREY HOLLADAY and CARTER | 34 | L.G. |
| 118 | TREY HOLLADAY and CARTER | 35 | M.C. |
| 119 | TREY HOLLADAY and CARTER | 36 | A.M. |
| 120 | TREY HOLLADAY and CARTER | 37 | M.C. |
| 121 | TREY HOLLADAY and CARTER | 38 | N.A. |
| 122 | TREY HOLLADAY and CARTER | 39 | C.D. |

| 123 | TREY HOLLADAY and CARTER | 40 | B.H. |
| 124 | TREY HOLLADAY and CARTER | 41 | A.A. |
| 125 | TREY HOLLADAY and CARTER | 42 | A.H. |
| 126 | TREY HOLLADAY and CARTER | 43 | A.D. |
| 127 | TREY HOLLADAY and CARTER | 44 | J.P. |

Each in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.

## FORFEITURE ALLEGATION-1

A.     The allegations contained in Count 1 of this Indictment are hereby realleged and

incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States

Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461.

B.     Upon conviction of the offenses in violation of Title 18, United States Code,

Section 371, set forth in Count 1 of this Indictment, the defendants,

WILLIAM LEE HOLLADAY, III a/k/a "Trey,"
DEBORAH IRBY HOLLADAY a/k/a "Deb,"
WILLIAM RICHARD CARTER, JR. a/k/a "Rick,"
GREGORY EARL CORKREN a/k/a "Greg,"
DAVID WEBB TUTT, and
THOMAS MICHAEL SISK a/k/a "Tom,"

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all proceeds obtained, directly or indirectly, from the offenses in violation of Title 18, United States Code, Section 371.

C.  If any of the property described above, as a result of any act or omission of the defendants:

(1)  Cannot be located upon the exercise of due diligence;

(2)  Has been transferred or sold to, or deposited with, a third party;

(3)  Has been placed beyond the jurisdiction of the court;

(4)  Has been substantially diminished in value; or

(5)  Has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c) .

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461.

## FORFEITURE ALLEGATION-2

A.  The allegations contained in Counts 2-92 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461.

B.  Upon conviction of the offenses in violation of Title 18, United States Code, Section 1343 set forth in Counts 2-92 of this Indictment, the defendants,

77

WILLIAM LEE HOLLADAY, III a/k/a "Trey,"
DEBORAH IRBY HOLLADAY a/k/a "Deb," and
WILLIAM RICHARD CARTER, JR. a/k/a "Rick,"

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C)

and Title 28, United States Code, Section 2461, all proceeds obtained, directly or indirectly, from

the offenses in violation of Title 18, United States Code, Section 1343.

C.     If any of the property described above, as a result of any act or omission of the

defendants:

(1)     Cannot be located upon the exercise of due diligence;

(2)     Has been transferred or sold to, or deposited with, a third party;

(3)     Has been placed beyond the jurisdiction of the court;

(4)     Has been substantially diminished in value; or

(5)     Has been commingled with other property which cannot be divided without
          difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section

982(b)(1) and Title 28, United States Code, Section 2461(c) .

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United

States Code, Section 2461.

## FORFEITURE ALLEGATION-3

A.     The allegations contained in Counts 93-127 of this Indictment are hereby realleged

and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United

States Code, Section 982(a)(2)(B).

B.     Upon conviction of the offenses in violation of Title 18, United States Code,

Section 1028A(a)(1), set forth in Counts 93-127 of this Indictment, the defendants,

78

WILLIAM LEE HOLLADAY, III a/k/a "Trey,"
WILLIAM RICHARD CARTER, JR. a/k/a "Rick," and
GREGORY EARL CORKREN a/k/a "Greg,"

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(B),

any and all property constituting or derived from proceeds defendants obtained directly or

indirectly as a result of the offenses in violation of Title 18, United States Code, Section

1028A(a)(1).

      C.     If any of the property described in this forfeiture allegation, as a result of any act

or omission of the defendants:

        (1)     Cannot be located upon the exercise of due diligence;

        (2)     Has been transferred or sold to, or deposited with, a third party;

        (3)     Has been placed beyond the jurisdiction of the court;

        (4)     Has been substantially diminished in value; or

        (5)     Has been commingled with other property which cannot be divided
             without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United

States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

     All pursuant to Title 18, United States Code, Section 982(a)(2)(B).

A TRUE BILL:

                                                                Foreperson

LOUIS V. FRANKLIN, SR.
UNITED STATES ATTORNEY

Jonathan S. Ross
Assistant United States Attorney

Brett J. Talley
Assistant United States Attorney

Alice S. LaCour
Assistant United States Attorney

Verne H. Speirs
Assistant United States Attorney